**P STONE, INC., Plaintiff,**

v.

**KOPPERS COMPANY, INC., and Lycoming Silica Sand Company, Defendants.**

**Civ. No. 78–0720.**

United States District Court,
M. D. Pennsylvania.

July 2, 1982.

Clifford A. Rieders, Stuart, Murphy, Smith, Mussina, Harris & Rieders, Williamsport, Pa., for plaintiff.

John Bodner, Jr., Paul A. Koches, Howrey & Simon, Washington, D. C., for Koppers Corp.

Robert J. Sarno, McCormick, Reeder, Nichols, Sarno, Bahl & Knecht, Williamsport, Pa., for Lycoming Silica Sand Co.

## MEMORANDUM

RAMBO, District Judge.

Defendants have moved, pursuant to Rule 37 of the Federal Rules of Civil Procedure, for the sanction of dismissal of P Stone, Inc.'s complaint.[1] They claim *inter alia* that plaintiff has deliberately concealed or destroyed relevant evidence during the discovery process. The motion will be granted.

---

1. The relief requested in the motion included the additional sanction of a default in a related lawsuit, the taxation of costs and fees against plaintiff's counsel, the assessment of the costs and expenses of the Special Master's investigation against P Stone and its counsel, referral of

Plaintiff, a manufacturer of crushed limestone for use in construction, filed its complaint on July 26, 1978. It alleged that the defendants, also manufacturers of crushed limestone, have violated the Sherman Act, 15 U.S.C. §§ 1 and 2, and the Clayton Act, 15 U.S.C. §§ 13a, 15 and 26. On March 16, 1979, defendant Lycoming filed its first request for production of documents seeking P Stone's business records for the period covered by the complaint. The request at issue here was for:

> All worksheets, backup materials or other documents prepared or used by any person in connection with the preparation of any federal, state or local tax returns, financial statements, balance sheets, records and/or reports of P Stone, Inc.

Plaintiff's response was that the information had already been supplied in connection with three depositions. Plaintiff further replied that: "[I]f any other information is needed, a specific request should be filed." It is undisputed that at this time *no* inventory books had been made available to the defendants. Plaintiff's business records became the subject of a motion to compel. On July 19, 1979, Judge Muir of this court ordered the plaintiff to make available to the defendants production records and some

other items not relevant here. Following that order plaintiff's counsel sent the defendant copies of two inventory books. One book covered production from April 20, 1977 to October 18, 1978. The second begins with November 6, 1978 and ends on July 19, 1979. The cover letter accompanying these documents stated: "Please find enclosed documents responsive to Judge Muir's July 19, 1979, order." That letter is dated September 6, 1979.[2]

After receipt of the documents in September of 1979, the defendants informed plaintiff's counsel that they believed, on the basis of deposition testimony, that there was a second set of inventory records which had not been produced. Counsel for the plaintiff replied:

> You state that only one set of inventory records was produced and that there has been extensive deposition testimony regarding a second set of inventory records. I think you are incorrect and I think the testimony is clear that the records were kept at one office and later moved to another. Once again, if you would like to refer me to anything specific, I would be happy to see it and I will thereupon undertake diligent inquiry.[3]

this matter to the United States Attorney for investigation into whether obstruction of justice has been committed, and referral of the case to a disciplinary committee of the bar to evaluate the conduct of plaintiff's counsel in relation to the standards of professional responsibility.

Because there is no evidence showing that plaintiff's counsel had knowledge of the records which were either destroyed or suppressed, the court declines to sanction him directly except for a portion of the costs related to the special master's investigation. By the time of the briefing on the motion for the appointment of a special master there was sufficient evidence in the record of the existence of a complete second set of production records, that counsel had a duty to investigate the situation and offer an explanation to the court. The fact that no explanation was forthcoming, particularly the sudden appearance of a partial second set of inventory and production records, necessitated the appointment. Thus counsel should bear part of the costs and expenses.

The court will not refer the matter for disciplinary or criminal action. Defendants have that option as private complainants.

The related lawsuit, Civil Action No. 78–1033, was filed by Lycoming Silica Sand Company against W. A. Emrick Trucking, Inc., James P. McKeag, P Stone, Inc. and Paul F. Moats. It also alleges violations of the antitrust laws, but the claims relate to boycotts, tying agreements and other common law causes of action.

P Stone's costs of production are not critical to the allegations of the complaint. Because of the difference in the issues and parties, the court will not grant a default in Civil Action No. 78–1033.

2. Plaintiff's counsel seems to suggest in his brief in opposition to defendants' motion to dismiss and for sanctions (Doc. 627, p. 3) that inventory records were not subject to Judge Muir's July 19 order. However it is abundantly clear from the correspondence and the conferences between counsel that inventory records were very much at issue.

3. The testimony is hardly clear that the records were moved from one office to another. Indeed plaintiff's counsel has himself espoused two different versions of the supposed scenar-

Defendants answered this assertion with specific page references to three deposition transcripts all of which suggested that two inventory records were maintained. They received no response from plaintiff.

Thereafter counsel met, on November 23, 1979, to resolve outstanding discovery disputes. At that meeting the matter of the dual inventory records was raised again by the defendants. The following exchange occurred:

MR. BODNER: The last item on this order that I will raise is, as you may recall, Mr. Rieders, this order requires the production of the inventory records of P Stone, and in the course of the depositions, at least two, and possibly three sets of inventory records were referred to. We only have one set of inventory records. We would request any other sets of inventory records so we would have all inventory records that were either in the possession of P Stone at the plant location or at the office location at the Newberry Garage or the other place.

MR. RIEDERS: I think I responded to that before, but let me tell you again what I know about it. It is my understanding that the production records that were kept at the quarry were at some point transferred physically to the office at Newberry Garage. Therefore, there was only one set of books. There may

have been some sort of informal record kept on slips of paper, which one of the witnesses testified to, they are doing down at the quarry and then sending up to the Newberry Garage office for transposition onto the records. I am certain those slips of papers have been destroyed, which came from the quarry.

Once again, all I can do is ask my client. I have asked for everything responsive to these orders, and I believe I have been given everything responsive, but I have no objection to checking back.

MR. BODNER: I would appreciate if you would make one final check on that and tell us in writing in a week whether there are any other inventory records in the possession or control of P Stone which have not previously been produced, and if there are, they would be so produced. Document number 448, pp. 7, 8.[4]

Plaintiff did not produce additional inventory records.

Defendants moved for the appointment of a special master to investigate the inventory keeping practices of the plaintiff. In the course of the briefing on this motion, plaintiff used three inventory records as exhibits. Two were the ones previously produced. The third was a new record duplicating one of the previous records in dates (November 10, 1978 to November 1980), but containing different inventory

io. In document number 482, filed on February 28, 1980, responding to defendant's motion for a special master, he relates in his statement of facts:

Prior to <u>September, 1978</u>, or thereabouts P Stone maintained one inventory account at the P Stone quarry. When <u>William R. Hoffman</u> was retained at [sic] P Stone's accountant, he recommended that closer inventory records be kept, and pursuant to his recommendation, the inventory records were transferred from the P Stone quarry to the office of James McKeag in Linden.

Yet, in document number 570, filed on November 23, 1981, titled "Submission to the Master," counsel stated:

Beginning in April, 1977 (when the quarry began production) and continuing until February, 1978, one inventory book was maintained at the quarry. As of <u>February 27, 1978</u> upon the recommendation of <u>Don Herman</u>, P Stone's accountant at the time, the inventory book was physically transferred to

the office in Linden where Melissa Young took over recording the daily production slips.

As the court added underlining demonstrates neither the date of the supposed transfer nor the individual recommending it are the same in those two versions supplied by plaintiff. Despite representations to the contrary, apparently the deposition testimony is not clear even to plaintiff's counsel.

4. At the time counsel for plaintiff was making these assertions, there was on file with the bankruptcy court of this district the ensuing sworn statement, dated March 9, 1979 and signed by P Stone's president, James McKeag: "Daily estimated inventory records are located at P. O. Box 252, Jersey Shore, PA 17740 [the mailing address for the P Stone quarry], and R. D. # 2 Box 131 Linden, PA 17744 [the mailing address for P Stone's business office]."

figures. The sudden appearance of these records more than two years after Judge Muir's order and nearly two years after counsel's promise to search for them was not explained.

The motion for the appointment of a special master was granted. The master's report to the court was submitted on February 15, 1982. Based on that report and the evidence unearthed through discovery, the defendants moved to have the action dismissed. They claim that there is proof that records which existed after this lawsuit commenced have been either destroyed or deliberately suppressed. Further they believe they have been prejudiced in that the records which were initially supplied are fraudulent.

After a hearing and a careful review of the evidence the court has determined that defendants' claims have merit. The evidence that is most convincing is the testimony of Joseph Rebeck and the exhibits which corroborate it. Joseph Rebeck, an employee of The Standard Slag Company of Youngstown, Ohio, visited P Stone, Inc. on August 4, 1978 (after this lawsuit was in progress) for the purpose of evaluating the business for a possible acquisition by his company. Upon his return to Youngstown he drafted a memorandum to R. T. Beeghly, president of Standard Slag. The memorandum, dated August 7, 1978, had attachments. The special master procured the critical attachment from the files maintained by Standard Slag in Youngstown. That document shows a typed list of the inventory P Stone "officially" claimed to have on hand on July 31, 1978. The typed figures correspond, to the ton, with the data in the initial inventory records given defendants in September 1979. Beside the typed figures are handwritten figures. See Exhibit A attached to this memorandum. Joseph Rebeck had labeled the typed figures "Inventory for the Bank." The handwritten column he called "Inventory on the Daily Reports."

The special master questioned Rebeck about what inventory records he saw during his visit to evaluate P Stone. The following answer was given under oath:

Q. So the second set of inventory records that you are referring to is more in the form of a daily operating report which has more than just an inventory on it, it has something about the, as you say, the number of men operating, I don't know what else you would find. But it is not specifically just in connection with inventory?

A. Yes. Now, I don't remember exactly what all was on it, except it was inventory, and I did ask for the daily report. Because that gives you very indicative of how you are doing day by day, week by week, along with your daily production you show a running total of the inventory fluctuation. I saw that but I don't recall in what form it was relative to the type that we use. But that one having—I asked for that when I got back from my solo trip through the quarry and so on just to see what was available. And without measuring any of the inventory stockpiles out there, I would say his daily report was much more accurate than the other one. The other one was just blown clear out of proportion. Why? I don't know, I didn't ask, it was none of my business, but it sure stuck with me. Because what he showed or claims to have been the bank inventory sheets were—that material sure as hell was not out there. Interview of Joseph Rebeck by Stephen Schultz, Special Master, January 22, 1982, p. 9.

Plaintiff has offered no plausible explanation as to where Rebeck got these figures and why the records they came from have never been produced. Rebeck was an impartial investigator whose purpose at the time he prepared his memorandum in August of 1978 was to give his company an honest assessment of the value of P Stone. It was the "bank inventory," undoubtedly fraudulent, which was supplied defendants.[5]

---

5. The "bank inventory" is three times that of the daily production records kept at the quarry.

The discrepancy is too large and the differences are pervasive, running through the figures for

It is the only record produced to date for the critical 1977 and 1978 seasons.

Though the Rebeck evidence is the most convincing, it is not the only evidence of the existence of two inventory records which were not the same. Here the court is concerned with the period prior to November of 1978, since a second book for the later period did finally turn up.

William Hoffman, an accountant hired by P Stone in the fall of 1978 to do a financial statement, discovered that there was a mistake in the inventory records maintained at P Stone's business or main office, the Newberry Garage in Linden, Pennsylvania. In order to prepare an accurate financial statement it was necessary for him to turn to original production records (still in existence in the fall of 1978) to reconstruct actual inventory. The special master questioned him, under oath, about the inventory error and his actions to correct it:

Q. Okay. Can you tell me now again with respect to this inventory how you determined that there was a problem? What led you to believe there was a problem with the inventory?

A. Well, it really came up, McKeag was the one who really initiated it. As I was discussing costs and tracking the fall of information, he mentioned that there was—they had some errors in the inventory, he called them addition errors or computation errors, and then we got into just how much inventory was left at the prior year. And he said really there was no—the piles were down to nothing. There was almost no inventory left, whereas the inventory as per the statement was significant. I don't remember the numbers offhand. But that is what led into it. And then looking, he showed me the ledger that was maintained out at Newberry, the office, and showed me where the errors were in the additions of the tonnage, the daily production, and how it was overstated by so many thou-

sand tons, going from I believe one page to another.

.  .  .  .  .

Q. —I am trying to determine why something may not have been done about that sooner if she [Melissa Young, the bookkeeper at the Linden (Newberry Garage) office] knew that they existed, if she knew that they were bring [sic] forward errors or addition errors, why wouldn't they have done something about that rather than waiting for you to raise the question? I mean what is your impression of that?

A. I don't—I would assume it had something to do with the bank and the fact that it was zero inventory and lower profits, he was afraid of the bank loan being called. That normally is what happens when people overstate inventory, as you are aware of.

Q. Um-hum.

A. But at the time I, you know, would not issue any statement with that type of error in it involved. And we—you know, that is how—once that—I don't accept anybody telling me there is an error there without trying to trace—well, actually confirm the error by going to the daily production slips and production records to try to ascertain how many tons were produced, what was sold and what should be remaining. That is how I really became involved with going down to the quarry and looking at the original slips and the duplicates, because they were prepared in duplicate, one was kept at the quarry, and the quarry book was a notebook, if I'm not mistaken. It was a—they maintained also a perpetual record, but I believe it was a notebook form, not work sheets like that.

Q. But you would have a tendency, once having seen this particular—and let's assume, I am making an assumption now, when you refer to this double entry system, this—

each type of limestone. The court is convinced that the inflation of the inventory did not result

from clerical error or mere mistakes of addition.

A. I really don't know—(overlapping of voices)

A. Those sheets are something else.

Q. Your inclination would be—would your inclination have been to check with a perpetual record that was being kept at the quarry?

A. Yes.

Q. At the same time?

.    .    .    .    .

Q. What period of time did you do this examination? For instance—

A. I think I went back to almost the inception.

Q. Of the company?

A. Yes. Because it was only about a year and a half before that, I believe.

Q. Okay. If you will assume with me that apparently they started production in April of 1977?

A. Okay.

Q. Give or take a couple months. You feel that you had available to you two sets of perpetual inventory records which would have enabled you to watch the flow of the inventory from April of '77 through December 31, '77, I suppose first—

A. Right.

Q. —and you could check another set of inventory records at the quarry—

A. Um-hum.

Q. —to do the same thing.

Excuse me. I'm sorry.

VOICE: (Inaudible)

BY MR. SCHULTZ:

Q. And then on December 31, '77, that is how you arrived at an adjusted tonnage figure?

A. Yes.

Q. Now, you then, using that as a starting point, did you continue on through September of '78?

A. Yes.

Q. And trace from both sets of inventory records whatever they look like, maybe this at the office and maybe a notebook, but something at the quarry—

A. Yes.

Q. —did you trace the flow of the production and sales through September of '78?

A. Yes.

Interview of William Hoffman by Stephen Schultz, Special Master, pp. 6–12.

James McKeag, P Stone's president, was asked at the hearing on this motion to dismiss, about Hoffman's work and whether he would have had access to records at the quarry office. He unequivocally said Hoffman only went to the quarry office once, accompanied by McKeag. Pressed as to how he was certain of this he stated, "Nobody would have got to the records without my approval." Mr. McKeag's extremely selective memory, his attitude and evasiveness on the witness stand, and the statement quoted above, lead ineluctably to the conclusion that he knew there were inventory records at the quarry office, that those records revealed a far more dismal financial position than McKeag was willing to disclose and that he decided to destroy or suppress that information.

This conclusion does not mean that plaintiff's counsel participated in an attempt to defraud the court. However there is certainly evidence of a lack of diligence on counsel's part, particularly in light of defendants' documentation of the references to dual inventory records. It may be that plaintiff's counsel had no knowledge of the existence of the second set of records. Yet he offered no explanation for the sudden appearance in August of 1981 of a partial second set of inventory records. He presented no testimony to demonstrate that a thorough search for the records was made. Frustrated by the lack of information being presented by plaintiff at the hearing on this motion, the court finally asked a paralegal assistant from plaintiff's counsel's office to testify. She testified after the objection of plaintiff's counsel was overruled. The assistant indicated that the

late-produced partial set were handed to her, after a simple inquiry, out of a secretary's desk drawer at the plaintiff's quarry office. The visit to P Stone which revealed the whereabouts of the partial second set of inventory records was only the second she had made to the premises to look for the records. Apparently counsel's desperation at the thought that there might be an investigation of his compliance with this court's discovery order led him to make the inquiries of plaintiff that had been promised two years before.

■ The conclusion which has been reached compels dismissal of this action. Plaintiff has failed to comply with the order of July 19, 1979 requiring that production records be made available to the defendants. The sanction of dismissal is appropriate where there has been no good faith effort to obey the order. *National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976); *Societe Internationale v. Rogers*, 357 U.S. 197, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958). Here there is not only untimely production of the partial second set of inventory records, and production of fraudulent records but also no production of critical records that were in existence after the lawsuit began Plaintiff's costs of production would be a key factor in this antitrust case. Without accurate production figures defendants cannot determine what the costs were. To permit the action to continue when the production figures supplied the defendants are inaccurate, and plaintiff knew they were inaccurate, would be a mockery of justice.

## ORDER

IT IS HEREBY ORDERED:

1. This case is dismissed with prejudice.

2. Costs of the action shall be paid by plaintiff.

3. The costs and expenses of the Special Master's investigation are assessed as follows:

Plaintiff shall pay 90% of the total;

Plaintiff's counsel shall pay 10% of the total.

## EXHIBIT A

P. Stone Inc.

Inventory

July 31, 1978

|      | 1          | 2      |
|------|------------|--------|
| 1B   | 5,605 Tons | 3044   |
| 2B   | 21,363     | 14592  |
| #2   | 13,441     | 8170   |
| #1   | 15,438     | 7523   |
| 3A   | 3,352      | 400    |
| 4    | 3,970      | 1021   |
| 2A   | 26,362     | 4906   |
| 2RC  | 35,294     | 3700   |
| RR   | 18,959     | 1094   |
| SR   | 15,875     | 11,008 |
|      | 159,659 Tons | 55226 |

1 Inventory for the bank
2 Inventory on the daily reports