**Elvira M. WHITE, Plaintiff,**

**v.**

**OFFICE OF THE PUBLIC DEFENDER FOR THE STATE OF MARYLAND, et al., Defendants.**

Civil No. PJM 95–974.

United States District Court, D. Maryland.

Jan. 16, 1997.

Erroll D. Brown, Kirk A. Wilder, O'Malley, Miles & Harrell, Landover, MD, Maurice Foster, Washington, DC, for Plaintiff.

Lawrence Paul Fletcher–Hill, Office of the Attorney General, Baltimore, MD, for Defendants.

## OPINION

MESSITE, District Judge.

### I.

Elvira White, an African–American attorney, has sued the Office of the Public Defender for the State of Maryland and certain of its employees alleging discrimination in employment based on race. She contends, among other things, that because she is African American she was excluded from the decision-making process involving the discipline of one of her subordinates in the Prince George's County Defender's Office where she worked. She also claims that after she filed a complaint with the EEOC, her employer retaliated against her in a number of ways and on multiple occasions. Defendants not only roundly deny these claims; they allege numerous instances in which Plaintiff herself was the perpetrator of racist sentiments and offer several scenarios to explain why any emotional distress Plaintiff might suffer today is more likely the result of unhappy episodes in her personal life than of actions purportedly taken by Defendants.

The merits of this case, however, will not be resolved.[1] Because Plaintiff knowingly and intentionally destroyed critical evidence in the course of these proceedings, the Court has determined to grant Defendants' Renewed Motion for Sanctions and will dismiss Plaintiff's complaint with prejudice.[2] The Court explains the factual and legal predicate for its decision.

### II.

In 1981, Plaintiff, a graduate of the University of Maryland Law School, was hired as an attorney in the Office of the Public Defender for Prince George's County, the first African American female to be so engaged. She progressed through the ranks, becoming Chief of the Office's Juvenile Court Unit in 1990 and by 1992 Chief of its District Court Unit. By all accounts, at least until the Spring of 1992, Plaintiff was well regarded professionally. Indeed things were going sufficiently well that, beginning in 1988 and on several occasions through 1991, she sought appointment to the bench of the District Court for Prince George's County supported by a broad array of attorneys, judges, and political figures. In 1991, similarly supported, Plaintiff sought appointment to the Circuit Court for Prince George's County.[3]

According to Defendants, the picture began to change dramatically as Plaintiff failed in her bids to obtain appointment to the judicial vacancies. Eventually, say Defendants, Plaintiff started to suggest that racial bias might be impeding her efforts, although there is no indication that any individual actually appointed to the positions she sought was less than fully qualified. Furthermore, when a close gentleman friend of Plaintiff's died, she reportedly blamed that result in part on racism in the Prince George's County law enforcement establishment.

In early 1992, in the aftermath of the acquittal of the police officers in the Rodney King case and the ensuing riots in Los Angeles, Plaintiff supposedly made remarks

---

1. As will be discussed, the case has already tried once to a jury but ended in a mistrial when the jury was unable to agree on a verdict. Plaintiff has asked for a re-trial.

2. The Court expressly reserved its decision on Defendants' Motion for Sanctions filed prior to trial and their Renewed Motion filed following the mistrial.

3. It is relevant to note that in 1988 Plaintiff suffered a personal setback when she learned

that her husband was in fact already married. While this fact had no apparent impact on Plaintiff's professional achievement, it may well have had an impact on her emotional state, a critical issue in these proceedings. Indeed Plaintiff has indicated that it was only after learning of her husband's bigamy that she began to keep the manuscript she admits destroying, the act that occasions this Opinion.

(which she denies) that also presented her in a light quite different from before. The remarks concerned the beating certain rioters gave to a white truck driver who happened to be in the vicinity while the riots were in progress. According to Plaintiff's secretary, Ruthie Jones, who is white, Plaintiff angrily told her just after the event that she fully understood why the blacks had reacted as they did in response to the verdict. She further stated that it was right for the white truck driver to be beaten "if that's what it takes to recognize the injustice that's done to African Americans." When Jones asked if it had been an innocent person such as her daughter, who was going to a movie or the like, would it be right for someone to kill her just because she's white, Plaintiff answered "yes." Jones said she was shocked by the response and penned a letter to Plaintiff telling her so.

Little more than a week prior to this incident, the event took place that gave rise to the present litigation.

On April 22, 1992, Jeff Singman, an attorney who worked in the Prince George's Defender's Office under Plaintiff's direct supervision, engaged in some verbal sparring with African American inmates at the Prince George's County Detention Center and ended by calling them "Black Sambos." The encounter was immediately brought to the attention of Singman's supervisors in County Defender's Office, in particular Maureen Lamasney, Public Defender for the County. The office promptly denounced Singman's remark as racist and unacceptable. Plaintiff, by chance, was on vacation when the episode occurred but, on returning to work, learned of it and was incensed. She took immediate issue with the decision of Lamasney to reprimand Singman and have him apologize. Plaintiff's position was that Singman had to be more severely sanctioned if not fired. Tempers flared. At one meeting toward the end of April at which the Singman matter was discussed, Plaintiff reportedly began to recite her own experience with deprivation and racism and another supervisor told her that her experiences were unimportant, that everyone had a story to tell. Plaintiff responded by storming out of the meeting.

Lamasney determined that the proposed reprimand of Singman should go forward, but was caught up short by the intervention of Stephen Harris, Public Defender for the State. Harris had been contacted by certain African American elected officials, including Prince George's County State Senator Decatur Trotter, and asked to look into the Public Defender's handling of the Singman case. Although at the trial of this case Harris denied that Trotter or others pressured him, saying that the decision to fire Singman was his alone, Trotter testified that Plaintiff was indeed the one who had put him on to the Singman incident. Plaintiff has denied involving Trotter or others, but there is little question that many employees in the County Defender's Office perceived that she was in fact responsible for the political intervention and Singman's firing and resented her for it.

Thereafter Harris arranged for the County Defender's Office to undergo a racial sensitivity program which some office members felt was unnecessary and again blamed Plaintiff for.

Regardless of whose version of events is believed, things proceeded from bad to worse. Defendants claim Plaintiff became insupportably rude to co-employees and insubordinate to supervisors. Her unfounded charges of racism became intense and unremitting. Plaintiff, for her part, says she was unfairly given the cold shoulder by virtually everyone in the Defender's Office and it was they, not she, who were rude, uncooperative, and racist.

In February, 1993, Plaintiff filed an employment discrimination complaint with the Equal Employment Opportunity Commission, citing the stream of events that had begun with the Singman incident.

Meanwhile, she claims, Defendants had begun to retaliate. In the Fall of 1992, while Plaintiff was in pursuit of another vacancy on the Prince George's County Circuit Court, a copy of the letter from Plaintiff's secretary regarding the Rodney King riots reached the hands of a member of the local Trial Courts Nominating Commission. Plaintiff was apparently interrogated by Commission members as to her own possible "closet racism"

and was eventually found unqualified for a judicial seat, the first time that had occurred. Plaintiff suggests that her secretary's "fabricated" version of the encounter with Plaintiff continued to be used against her when she ran for a Circuit Court seat against certain sitting judges in the 1994 election.

Just days before filing her EEOC complaint, Plaintiff also became enmeshed in an ethical investigation arising out of her representation of a young woman charged with attempted burglary, during which Plaintiff attempted to negotiate a book deal not only for the client but for Plaintiff herself. In the same case, the County Defender's Office, upon investigation, came to the conclusion that Plaintiff had provided ineffective assistance to her client. Plaintiff's client, who was white, had acted with her boyfriend, who was black, in attempting to burglarize the home of the young woman's parents. The boyfriend was shot and killed by the young woman's father during the attempt. Despite her representation of the young woman, Plaintiff, in the opinion of the County Defender's Office, had shown inappropriate sympathy to the young man and his mother, both African American, and had compromised her client's defense by not suggesting that the young man had a more active role in planning the crime. Eventually a motion for new trial on the grounds of ineffective assistance was granted by a Prince George's County Circuit Judge.

Then, in the summer of 1993, Defendants apparently learned that Plaintiff might be engaged in the private practice of law in violation of a ban that, at least nominally, was in effect in the County Defender's Office. Although Plaintiff was indisputably involved in such practice to some extent, she contended that until she was cited other similarly situated white males in her office had not been pursued.

Among further indignities Plaintiff says she was subjected to in retaliation for her discrimination complaint were the denial of a performance evaluation, the monitoring of her daily activities, and the posting of offensive signs in her presence. Defendants deny each of these allegations and again suggest that Plaintiff herself was the source of any friction in the office.

In November 1993, the State Public Defender decided it might be better if Plaintiff were transferred to the Charles County Defender's Office in LaPlata. Although Plaintiff was sent to Charles County with no diminution of salary or responsibility and although the distance to her new office was not substantially greater from her home than to the Prince George's County Office, Plaintiff considered the transfer retaliatory. She also believes that the Charles County Defender's Office had been forewarned that she was a "troublemaker" and that her actions should be carefully monitored, which she says in fact is what happened.

The tension continued unabated through late March 1995, when, after having received a right-to-sue letter from the EEOC, Plaintiff filed the present suit.[4] In the course of the litigation, certain events occurred that bring the Court to the decision it reaches today. The Court turns its attention to these events.

### III.

One of the first discovery devices Defendants employed in this case was a request for production of documents sent to Plaintiff's counsel on or about July 28, 1995. Request No. 1 was for:

Any and all documents, including but not limited to journals, diaries, or calendars, which contain any notes or other recordings plaintiff or any other person made of events in the workplace concerning plaintiff's employment by the Office of the Public Defender.

Plaintiff's counsel responded generically to the requests, indicating that "[a]ll the documents requested are available for inspection and copy" in counsel's office. The response

---

**4.** On July 20, 1996, shortly prior to trial, Plaintiff was fully and finally terminated from her employment with the Office of the Public Defender. Although the Court offered Plaintiff the opportunity to amend her complaint to bring the circumstances of the termination into the present suit, Plaintiff declined to do so. Given the Court's ruling in the present case, it remains to be seen whether and to what extent Plaintiff may have any claim based on the termination.

asserted no privilege or any other reason why documents would not be produced.

At her first deposition session on November 30, 1995, Plaintiff stated that she was sure she had reviewed the document requests and that she was aware she had a responsibility to produce any document in her possession and under her control. At that time and at her resumed deposition on December 5, however, it was clear Plaintiff had yet to conduct an extensive search for responsive documents.

At her November 30 deposition Plaintiff did specifically identify a "red spiral tablet that has notes in it" "that everybody in the Upper Marlboro saw me writing in." She described it as smaller than 8½ by 11 inches, with spiral binding, a red cover and white-lined pages. She indicated she had started making entries in this notebook after the Singman incident in April 1992 and that it was approximately ⅛ full of notations. As of her November 30 deposition, Plaintiff indicated she could not locate the notebook although she had not searched every part of her house for it. She specifically denied destroying it or giving it to counsel.

At her third deposition session on January 22, 1996, Plaintiff revealed the existence of yet another document, which she referred to as her "book," "a work in progress," which she had kept between July 1988 and the present.

Plaintiff had the following colloquy with defense counsel:

Q. What do you mean by using your book?

A. I have a book that I wrote.

Q. So you had one that you had written yourself?

A. Yes.

Q. Is that currently in existence?

A. Parts of it are.

Q. When did you start writing your book?

A. July 23rd—July 25th, 1988.

Q. Why does that date stand out in your mind?

A. It's the date I found out my husband committed bigamy.

Q. How long is a book or parts of a book that you have written?

A. Maybe a couple hundred pages. Maybe.

Q. And over what period have you written it?

A. Over the past seven and a half years.

Q. So, essentially, from July 1988 to the present?

A. Yes.

Q. And is it a work in progress?

A. Yes.

Q. Is it all autobiographical?

A. Yes.

Q. Does it include events after July of 1988?

A. Yes.

Q. Does it include events up to the present?

A. You're in it. Yes.

Q. Is it entirely a factual account?

A. Yes.

Q. How much have you written in the last year?

A. No more than—in the last year, no more than 25 pages.

Q. How many copies of the draft exist?

A. One. One, as far as I know.

Q. Does it exist in hard copy, as opposed to computer disk or something of that sort?

A. The first hundred and some pages, someone typed for me on a computer.

Q. And how about portions subsequent to that?

A. They're handwritten by me.

Q. Before today, are your counsel aware of the existence of this manuscript?

A. No.

Q. Does the manuscript include accounts of events related to your lawsuit?

A. It only includes those portions which my counsel instructed me to keep as a part of my documentation to them as to what was going on.

Q. I don't think I understand your answer. The manuscript includes portions which your counsel instructed you to keep?

A. In terms of—when I filed the E.E.O.C. case—

Q. Un-huh.

A. —I was instructed to keep notes about what was happening to me.

Q. And those notes are a part of the manuscript?

A. No. Dates are. Some dates might be.

Q. The dates are put in—are in a manuscript?

A. The accounts are different.

Q. What do you mean by "the accounts are different"?

A. The work product, the notes that I've kept for my counsel, are different in the way that they're written. And the accounts for my counsel, they're strictly factual. And my book portion, they're more emotional.

Q. Is your book fictional?

A. There's some fiction, some nonfiction.

Q. You stated a moment ago that I'm in your manuscript; is that correct?

A. Yes.

Q. Am I in it as—under my own name?

A. No. The names have been changed to protect the innocent.

Q. Does it include an account of your deposition?

A. No, haven't gotten that far.

Q. Are persons from the office of the public defender in the manuscript?

A. Not by name.

After the third deposition session, defense counsel discussed the deficiencies in Plaintiff's production of documents with her counsel. A letter agreement between counsel executed between May 17, 1996 and June 24, 1996 reflects Plaintiff's counsel's representation that, with regard to the Plaintiff's autobiographical manuscript, "the document no longer exists." Defense counsel, however, expressly reserved the right to examine Plaintiff concerning the status of the book.

Plaintiff's final deposition session occurred on July 1, 1996. Plaintiff at that time disclosed that on January 22, 1996, the same day she revealed its existence, she had deliberately destroyed the book manuscript:

Q. Do you also recall testifying in January of 1996 about the existence of a manuscript or draft of a book about yourself?

A. Yes.

Q. And do you have that manuscript or draft now?

A. No.

Q. Where is it now?

A. I destroyed it.

Q. When did you destroy it?

A. The day I walked out of the depositions.

Q. Why did you destroy it?

A. Because I wasn't going to have anyone associated with this case making money off of my life.

Q. Did you understand at the time that you destroyed it that it was a document that may have relevance to this case?

A. No.

Q. Did you understand at the time that you destroyed it that it was a document that the defendants sought in this case?

A. Not pursuant to the question you asked me. No.

Q. What do you mean by that answer?

A. You asked me, during the course of the deposition, whether I had written anything since the beginning of the depositions, and my response was yes, and I had written about you.

 * * * * * *

BY MR. FLETCHER–HILL:

Q. How did you destroy the document?

 * * * * * *

THE WITNESS: I tore it up in little pieces—

BY MR. FLETCHER–HILL:

Q. What did you do with it?

A. —and put it in the trash.

Q. Where did you put it in the trash?

A. In a trash bag.

Q. Where did you do that?

A. In the kitchen of my home.

Q. Was anyone else present?

A. No.

Q. Did anyone review that document before you destroyed it?

A. No.

Q. Did you discuss the destruction of it with anyone?

A. No.

\* \* \* \* \* \*

Q. And the destruction—that is the tearing up of it and putting it in the trash bag—occurred the same day as the deposition; is that correct?

A. Yes.

Q. As soon as you went home?

A. Yes.

Q. Did you review it at all before you destroyed it?

A. No. It's in my brain. No.

Q. Did you ever make copies of it?

A. No.

Q. Was that document—was any part of that document typewritten?

A. No.

Q. Was any part of that document handwritten?

A. All of it.

Q. What type of paper was it on?

A. Legal paper.

Q. White or yellow?

A. I don't remember.

Q. How long was it?

A. Couldn't have been any more than a half dozen pages.

Q. You stated a moment ago, I think, that the reason you destroyed it was because you didn't want anyone else profiting from it; is that correct?

A. Yes.

Q. How did you think that anyone would profit from it?

A. Because I had been told that my life was worth something.

Q. Who told you that?

\* \* \* \* \* \*

Q. Did you destroy that document because it had information about this case in it?

A. I destroyed it because it was my personal thoughts and it had nothing complimentary about you in it.

Q. Did you destroy it solely because of its content about me?

A. No.

Q. Did you destroy it because of its contents about persons in the public defender's office?

A. No. It wasn't the sole reason. No.

Q. Did you destroy it because you didn't want the contents of it to be known in this lawsuit?

A. I destroyed it because it was my therapy for the personal pain that this office has put me through, and I didn't feel like anybody else should read about my pain until I was ready to tell it.

Q. Was that document prepared in connection with any professional therapy that you received?

A. Professional therapy? No.

At that session, Plaintiff also claimed not to know the whereabouts of the red notebook which she claimed to have last seen when she provided documents to her prior counsel.

Soon after, Defendants filed a Motion to Compel and a Motion for Sanctions, including a request, in view of Plaintiff's intentional destruction of the manuscript, that her suit be dismissed. Plaintiff's counsel filed no response until the morning of trial. Then, for the first time, he argued that the requested documents were protected by the attorney-client privilege and the work product rule. Defense counsel protested that neither privilege had been asserted previously and that Plaintiff herself had testified that the manuscript and a substantial portion of the red spiral notebook were documents she had prepared in advance of the litigation, that her counsel did not even know the existence of the manuscript. When directly asked by the Court, Plaintiff confirmed the accuracy of defense counsel's statements. The Court thereupon held Plaintiff's claims of privilege inapplicable. Plaintiff then gave the Court this explanation of her destruction of the manuscript:

MS. WHITE: With regard to the manuscript, I started writing a manuscript in

1988 which starts with my life at age five and goes up through 1988, the events in my life. I have that. Mr. Hill asked me—

THE COURT: You say you had or you have?

MS. WHITE: I have it. Mr. Hill asked me during the deposition if I had been writing anything during the course of the litigation and I said yes, and he said, "What have you written," and I said, "Some things," which I think the deposition will bear out—I said, "Some things which are not complimentary to you as well as anybody else," and that was the end of that at that day. When I went home I tore up—it was six pages. I tore it up, because I wasn't asked to keep it. The next deposition he asked me where it was and I told him, "It's torn up." So, there are three separate things. And that manuscript—

THE COURT: Wait a minute. I have a manuscript, a red spiral notebook. What's the third item?

MS. WHITE: The third item is what he asked me about when Mr. Brown was not at the deposition. I think it was in January or February. He asked me, "Have you written anything through the course of the litigation," and I said, "Yes. I have about six handwritten pages." I wasn't asked at that deposition, you must preserve and keep your private thoughts. So I didn't. But I do have a manuscript, which I said starts at age five, talks about my life, what I went through, and it goes up through 1988, nothing about the Public Defender's Office, nothing about anything—it's about me, my family, what we want through. That's what it is.

Again defense counsel vigorously objected, claiming that Plaintiff had changed her story radically. The document Plaintiff and her counsel previously claimed to have been totally destroyed was now said to have been only partially destroyed. Instead of some 200 pages having been destroyed, only some

6 were said to have been disposed of. Instead of covering the years between 1988 and 1996 and events and persons in the Prince George's Defender's Office, the manuscript—except for the six pages—was said to cease covering events after 1988.

The Court expressed concern over the situation, but with the two-week trial scheduled to begin that morning, decided to reserve on Defendants' Motion for Sanctions. The Court ordered Plaintiff to produce such part of the manuscript as she still might have and any other responsive documents by the following morning, the second day of trial. Defense counsel meanwhile was given leave to refer to Plaintiff's destruction of evidence in his opening and closing statements to the jury, as well as to cross-examine her as to the facts surrounding the destruction.

The next morning Plaintiff's counsel delivered to the Court and defense counsel perhaps a dozen handwritten pages of notes, ostensibly the remains of her autobiographical manuscript. The notes contained no description of events after 1988, failing, among other things, to mention Plaintiff's reaction in July, 1988, to the discovery of her husband's bigamy, the event which occasioned Plaintiff's preparation of the manuscript in the first place.

The case then tried to a jury over the next approximately two weeks. Certain of Plaintiff's claims went out on Defendants' Motion for Judgment, others were reserved for post-trial decision. After three days of deliberation, the jury deadlocked and the Court granted the parties' joint motion for a mistrial. Defendants orally renewed their Motion for Sanctions and again the Court reserved, asking counsel to file a written motion.

Defendants' written Renewed Motion for Sanctions has now been filed; Plaintiff has responded. Defendants ask for outright dismissal of Plaintiff's case or alternatively a ruling preventing Plaintiff from recovering any damages for emotional distress.[5]

---

**5.** Defendants' Renewed Motion deals only with the autobiographical manuscript, not the red spiral notebook which Plaintiff claims she has been unable to find and which both her prior and present counsel have been unable to account for.

The Court assumes Defendants no longer seek sanctions regarding the red spiral notebook and accordingly does not base its decision on the nonproduction of that document.

## IV.

In federal practice, two principal sources authorize a court to impose sanctions when evidence is destroyed in the course of a legal proceeding.[6] First is Fed.R.Civ.P. 37(b)(2), dealing with a party's failure to comply with a court order. Second is the inherent authority of the court. A third source, particularly applicable where an attorney is involved in the destruction, is Rule of Professional Conduct 3.4 dealing with counsel's obligation of fairness to an opposing party and counsel. The Court considers these sources and their interrelation.

(A) Fed.R.Civ.P. 37(b)(2) provides in pertinent part:

If a party or an officer, director, or managing agent of a party or a person designated under Rule 30(b)(6) or 31(a) to testify on behalf of a party fails to obey an order to provide or permit discovery . . . the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:

(A) an order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order;

(B) An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting him from introducing designated matters in evidence;

(C) An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party;

(D) In lieu of any of the foregoing orders or in addition thereto, an order treating as a contempt of court the failure to obey any orders except an order to submit to a physical or mental examination . . .

In lieu of any of the foregoing orders or in addition thereto, the court shall require the party failing to obey the order or the attorney advising him or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust.

The cases are in accord that, before a party can be sanctioned under this Rule, an order compelling production of the document must be violated. *See, e.g., Buffington v. Baltimore County, Maryland,* 913 F.2d 113, 133 n. 15 (4th Cir.1990) *cert. denied,* 499 U.S. 906, 111 S.Ct. 1106, 113 L.Ed.2d 216 (1991); *see generally* Gorelick, *supra* note 6, § 3.4.

■ In addition, Gorelick, the leading and possibly the only treatise on the subject of destruction of evidence, identifies four elements that a court must find before imposing sanctions for the destruction:

(1) An act of destruction;

(2) Discoverability of the evidence;

(3) An intent to destroy the evidence;

(4) Occurrence of the act at a time after suit has been filed, or, if before, at a time when the filing is fairly perceived as imminent. *Id.* at §§ 3.8–3.12.

As Gorelick notes, a fifth element is in a sense always required, namely prejudice to the opposing party, since sanctions are not as a rule imposed where there has been no prejudice to a party. But since the extent of the prejudice bears more on the issue of the scope of the sanction to be imposed rather than the issue of whether any sanction should be imposed at all, discussion of that element may be deferred until the scope issue is addressed.

The Court begins by defining the four elements that justify the imposition of sanctions.

---

**6.** Other sources sometimes cited include (1) Fed. R.Civ.P. 37(d), requiring parties to serve a written response to requests for inspection; (2) the Due Process clause of the U.S. Constitution; (3) Fed.R.Civ.P. 11, concerning a party's obligation to conduct a reasonable inquiry before filing pleadings; and (4) Fed.R.Civ.P. 26(g), concerning the same obligation with respect to discovery responses. *See generally* Jamie S. Gorelick et al., *Destruction of Evidence* § 3.6 (1989) (hereinafter "Gorelick").

(1) Destruction of evidence obviously includes physical destruction, *see, e.g., P Stone, Inc. v. Koppers Co.*, 94 F.R.D. 662 (M.D.Pa. 1982) (destruction or suppression of inventory records); *In re Estate of Soderholm*, 127 Ill.App.3d 871, 874, 878–79, 82 Ill.Dec. 876, 882, 469 N.E.2d 410, 416 (1984) (burning of diaries), but such acts as alteration or removal of evidence beyond the reach of the court would also qualify. Gorelick, *supra* note 6, § 3.9.

 (2) Discoverable evidence, as might be expected, extends beyond admissible evidence and includes evidence "reasonably calculated to lead to the discovery of admissible evidence, . . . reasonably likely to be requested during discovery, and/or [which] is the subject of a pending discovery request." *Wm. T. Thompson Co. v. General Nutrition Corp., Inc.*, 593 F.Supp. 1443, 1455 (C.D.Cal. 1984). *See also* Gorelick, *supra* note 6, § 3.10. In this regard, while privilege is theoretically a defense to a motion for sanctions, the fact remains that whatever legitimate grounds may exist for challenging a party's right to inspect documents must still be asserted in accordance with court rules. *See, e.g., Veeder v. Trustees of Boston College*, 85 F.R.D. 13, 14 (D.Mass.1979) (sanctions deemed appropriate regardless of whether document request was objectionable). Objections to document requests, for example, including claims of privilege, must be specifically stated, Fed.R.Civ.P. 34(b), otherwise they will be deemed waived. *See* 8 C. Wright, A. Miller, & R. Marcus, *Federal Practice and Procedure*, §§ 2016.1–2016.2 (2d ed. 1994).[7]

 (3) Intent means knowledge, actual or constructive, that discoverable evidence is relevant to pending litigation, although it has also been held to extend to knowledge of imminent or reasonably foreseeable litigation. *Wm. T. Thompson Co.*, 593 F.Supp. at 1455; Gorelick, *supra* note 6, § 3.11. Actual knowledge refers to a subjective disposition to destroy the evidence, *e.g., Wm. T. Thomp-*

son Co., 593 F.Supp. at 1456. At the same time, a party may be deemed to constructively know that a document is relevant to litigation because she was placed on notice by the opposing party. "Courts have held that parties are placed on notice that documents are relevant to litigation by court orders, discovery requests, and preservation agreements." Gorelick, *supra* note 6, § 3.11 at 98. *See also Rogers v. Chicago Park District*, 89 F.R.D. 716 (N.D.Ill.1981) (notice given by virtue of document request). Finally, parties have been deemed to know that documents are relevant to litigation when it is reasonably foreseeable that a lawsuit will ensue and that the evidence will be discoverable in connection with that suit. Gorelick, *supra* note 6, § 3.11.

 (4) Occurrence of the act of destruction after litigation has begun makes the imposition of sanctions especially appropriate, although again destructive acts occurring prior to the filing of a complaint where the potentiality of litigation is clear may also merit sanctions, *e.g., Wm. T. Thompson Co.*, 593 F.Supp. at 1455.

 (B) In addition to the federal rules of civil procedure, courts have relied on their inherent authority to impose sanctions for bad faith conduct during litigation. In the context of destruction of evidence, while there is every reason to suppose that the elements determinative of whether a sanction should be imposed based on the Court's inherent authority are identical to those applicable under Fed.R.Civ.P. 37(b)(2), reliance upon the court's inherent authority as the source of the sanction permits the court to reach situations the federal rules of procedure do not cover. This would not only include sanctions for cases of pre-filing destruction but, what is more appropriate to the present case, situations where the application of Rule 37(b)(2) would essentially be futile because the evidence is already known to have been destroyed.[8]

---

**7.** Under no circumstances would the fact that a party might fear "humiliation and intrusion" if she turned over her personal writings provide a basis for refusing to produce the writings. *See Zises v. Dep't of Social Services of Human Re-*

*sources Admin. of City of New York*, 112 F.R.D. 223, 227 (E.D.N.Y.1986).

**8.** Relying on this foundation also accommodates the problem of any entitlement that a party might

■ The U.S. Supreme Court has acknowledged a court's inherent authority on several occasions. "The inherent powers of federal courts are those which 'are necessary to the exercise of all others.'" *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764, 100 S.Ct. 2455, 2463, 65 L.Ed.2d 488 (1980) (quoting *United States v. Hudson*, 11 U.S. (7 Cranch) 32, 34, 3 L.Ed. 259 (1812)). The power "is governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Link v. Wabash R. Co.*, 370 U.S. 626, 630–31, 82 S.Ct. 1386, 1389, 8 L.Ed.2d 734 (1962). The Court has relied on the inherent authority concept to sanction discovery abuse. *See, e.g., id.* at 626, 82 S.Ct. at 1386 (awarding attorney's fees against counsel for failure to comply with discovery orders). Moreover, the Court has expressly held that the various sanctioning provisions in the Federal Rules of Civil Procedure, including Rule 37, do not displace a court's inherent power to impose sanctions, presumably up to and including the power to dismiss a lawsuit outright. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). Notably, the Fourth Circuit cited the inherent power of the trial court, in contrast to Fed.R.Civ.P. 37(b)(2), as the basis for sanctioning a party's violation of the duty to supplement a document request. *Buffington*, 913 F.2d at 133 n. 15.

(C) A final source relevant to the decision to impose sanctions for the destruction of evidence—especially where an attorney is involved in the act—is Rule of Professional Conduct 3.4. That rule, adopted as Rule 3.4 of the Maryland Lawyer's Rules of Professional Conduct and made applicable in this Court by Local Rule 704, provides in pertinent part:

A lawyer shall not:

(a) unlawfully obstruct another party's access to evidence or unlawfully alter, destroy or conceal a document or other material having potential evidentiary value.

The Comment to the Rule elaborates:

The procedure of the adversary system contemplates that the evidence in a case is to be marshalled competitively by the contending parties. Fair competition in the adversary system is secured by prohibitions against destruction or concealment of evidence, improperly influencing witnesses, obstructive tactics in discovery procedure, and the like.

The general "Scope" note to the Rules indicates that "[s]ome of the Rules are imperatives, cast in terms of 'shall' or 'shall not.' These define proper conduct for purposes of professional discipline." It also says that the Rules "are not designed to be a basis for civil liability ... [and the] fact that a Rule is a just basis for a lawyer's self-assessment, or for sanctioning a lawyer under the administration of a disciplinary authority, does not imply that an antagonist ... has standing to seek enforcement of the Rule."

In the present case, the Court cites the Rules of Professional Conduct not as an independent source of authority for granting Defendants the relief they seek. Rather, the Rules are noted insofar as they bear upon what Plaintiff, a Maryland attorney and a member of the Bar of this Court as distinguished from a layman, knew or ought to have known with regard to her obligations pertaining to destruction of evidence at the time she undertook to destroy her autobiographical manuscript in these proceedings.

## V.

(A) On the morning of trial, the first time Plaintiff responded to Defendants' Motion to Compel and for Sanctions, the Court ordered Defendant to produce her manuscript the following day. To that extent the Court invokes Federal Rule of Civil Procedure 37(b)(2) as authority for determining whether

---

have, under Rule 37(d), to notice before the sanction of dismissal with prejudice is imposed. *See Hathcock v. Navistar International Transportation Corp.*, 53 F.3d 36, 40–41 (4th Cir.1995). A party who has removed any possibility of warnings by destroying evidence before a court order can be issued cannot in fairness thereby immunize herself from the ultimate sanction of dismissal. In such a case, the inherent authority of the court provides an alternative basis for imposing the sanction if the circumstances otherwise warrant it.

sanctions should be imposed in this case. At the same time, in weighing the propriety *vel non* of sanctions, the Court expressly relies on its inherent authority to control discovery. Given that Plaintiff in fact admitted that she destroyed the manuscript prior to the existence of a court order, the entry of any order more extensive than the Court's oral directive at trial would have been a mere formality and essentially futile.

The Court considers whether there is a basis for imposing sanctions according to the analysis set forth in Part IV.

(B) The Court finds as a fact that Plaintiff (but not, in any way, her attorneys) engaged in an act of destruction. In the course of this litigation, she possessed an approximately 200–page autobiographical manuscript, a substantial portion of which covered events bearing directly on her claims before the Court. At a minimum, as her counsel advised the Court on the morning of trial, Plaintiff destroyed "most" or a "majority" of this manuscript. Plaintiff's suggestion on the morning of trial that she only tore up 6 pages is not credible. Moreover the Court finds Plaintiff lied at her July 1996 deposition when she stated that she had destroyed the manuscript, since it is clear she had not in fact destroyed the part running to 1988, the existence of which she revealed for the first time at trial. Plaintiff made no distinction at her January 1996 deposition between her pre-1988 and post–1988 accounts and there can be no mistaking that at her July 1996 deposition she intended for defense counsel to believe that she had destroyed the entire manuscript. The destruction, as Plaintiff herself testified, involved her tearing up the manuscript into little pieces and throwing it in the trash. According to Plaintiff, only that copy existed.

Next, the evidence destroyed by Plaintiff was unquestionably discoverable. Substantial portions of the manuscript almost certainly would have been admissible; virtually all of it can be assumed to have been reasonably calculated to lead to the discovery of admissible evidence bearing on questions of both liability and damages. *See Rogers,* 89 F.R.D. at 718 ("[T]he fact that the defendant had patronage letters in its files and destroyed them after this action was instituted strongly suggests that they were significant evidence with respect to whether or not it adhered to a patronage system.").[9] Thus one can only assume that a pen as sensitive as Plaintiff's would have made notations about the Singman incident, Plaintiff's subsequent interactions with supervisory colleagues (including whether or not she was actually excluded from a meeting because of her race)[10], as well as every other indignity she claims to have suffered following the Singman event. Additionally, Plaintiff's emotional reaction upon discovering her husband's bigamy, the later death of her gentleman friend, her disappointment in failing to secure appointments to the judicial office, the Rodney King case, and Plaintiff's encounter with her secretary, Ruthie Jones, would all almost certainly have found a place among her notations. Because Plaintiff has posited a claim for emotional distress caused by Defendants, any and all episodes that might

---

**9.** "It is a maxim of law, bearing chiefly on evidence, but also upon the value generally of the thing destroyed, that everything most to his disadvantage is to be presumed against the destroyer (*spoliator*), *contra spoliatorem omnia praesumuntur.*"

"Spoliator," *Black's Law Dictionary* 1401 (6th ed. 1990).

**10.** This episode is especially important because it appears to be the only instance in which a term of Plaintiff's employment may have been affected by reason of her race. That is, by one construction of the event Plaintiff was constructively excluded from the meeting because her experience and views as a black woman were considered unimportant.

In contrast, Singman's racist remark to Public Defender clients constituted no employment action as far as Plaintiff was concerned and her complaints about the conduct would not qualify as opposing a practice violative of Title VII to sustain a claim of retaliation. *See Crowley v. Prince George's County, Maryland,* 890 F.2d 683 (4th Cir.1989).

But whether or not Plaintiff had a valid underlying claim of discrimination, she would still be able to proceed on the basis of retaliation to the extent her proof suggested retaliation for having filed a claim with the EEOC. *See Ross v. Communications Satellite Corp.,* 759 F.2d 355, 357 n. 1 (4th Cir.1985).

otherwise account for her emotional distress would have been directly relevant.

The Court also finds that the Plaintiff knowingly and willfully intended to destroy discoverable evidence, *i.e.* she had a subjective disposition to extinguish evidence she knew to be relevant. Her statements to the contrary are not believable. She is a member of the Bars of the Maryland Court of Appeals and of this Court and she gained admission as such by professing to know the Rules of Professional Conduct. Rule 3.4 prohibits unlawful destruction of evidence having "potential evidentiary value." Beyond that, Plaintiff was specifically placed on notice as to the relevance of her manuscript both by Defendants' document request and by defense counsel's inquiry at Plaintiff's January 1996 deposition. Plaintiff's suggestion that she did not understand defense counsel to be asking for the manuscript, as with much Plaintiff has to say about the manuscript, is fatuous and not worthy of belief. Any claim of privilege by her, moreover, came too late on the morning of trial. No such claim was asserted either at the time Plaintiff responded to Defendants' document request nor at any time up to the morning of trial. Any entitlement to assert privilege, as the Court found then and reaffirms now, was waived.

Finally, as to the timing of Plaintiff's act, the fact that it occurred well after she filed this litigation, makes her action particularly suitable for the imposition of sanctions.

The extent of the sanction to be imposed leads to a final consideration, the extent to which Defendants have been prejudiced by Plaintiff's act.

## VI.

■ Gorelick points out that, in the absence of prejudice to a party, sanctions are not ordinarily imposed for destruction of evidence, Gorelick, *supra* note 6, §§ 3.16–3.17. *See, e.g., Struthers Patent Corp. v. Nestle Co., Inc.,* 558 F.Supp. 747, 766 (D.N.J.1981). Prejudice, in common parlance, means injury or detriment to a party; in the context of sanctioning discovery violations, it necessarily includes an inquiry into the materiality of non-produced evidence. *See Mutual Federal*

*Sav. and Loan Ass'n v. Richards & Assocs., Inc.,* 872 F.2d 88, 92 (4th Cir.1989). Prejudice obviously varies from case to case. Gorelick identifies a number of scenarios:

(1) Prejudice in terms of attorney's fees and costs incurred to pursue a sanctions motion, even where no harm has been done to the moving party's case;

(2) Prejudice in terms of the cost of reconstructing destroyed data where that is possible;

(3) Prejudice as to a given issue or issues where the moving party is irremediably unable to deal with the issue or issues; and

(4) Prejudice where the destruction bears on so many issues or on dispositive issues that a limited-issue related sanction will not adequately redress the destruction.

Gorelick, *supra* note 6, § 3.16.

In the present case, there can be no question that harm has been done Defendants by Plaintiff's act of destruction. The time and expense to Defendants of pursuing the remedy of sanctions are the least of their worries. It is clear that the document in question cannot be reconstructed. Plaintiff's own testimony is that, but for a few pages, her notes were handwritten and only a single copy existed. It would be naive to think that Plaintiff could reconstruct the document she destroyed with the same candor and genuine sentiment that presumably characterized the original.

The real question in this case is the extent to which the Plaintiff's act has prejudiced Defendants as to a single issue or a few issues as opposed to multiple interconnected, potentially dispositive, issues.

One may only suppose that Plaintiff's manuscript contained explicit factual annotations going to several matters bearing upon the issue of Defendants' liability. The following possibilities come to mind:

How did Plaintiff really *feel* about the Rodney King riots?

What did she say to her secretary Ruthie Jones?

Did Plaintiff contact political figures after the Singman incident?

What role did she in fact play in Jeff Singman's firing?

With regard to what may be the only basis for a claim of outright racial discrimination—her alleged constructive expulsion from a session at which Singman's discipline was discussed—did that matter cause her enough concern to even be remarked in the manuscript?

As to each of the episodes that followed the Singman incident—Plaintiff's interactions with Public Defender personnel, the allegedly offensive signs, and Plaintiff's reassignment to Charles County—to what extent were they worthy of recording? Did Plaintiff record them differently in her manuscript than she reports them now?

Plaintiff has also claimed emotional distress by reason of Defendants' action in this case; indeed, since Plaintiff never suffered any reduction of income, it may be that emotional injury is the only substantial element of damage for which she could recover in any event. But Plaintiff has indicated that she commenced her manuscript upon learning of her husband's bigamy, undoubtedly a painful episode for her. She also suffered distress at the loss of her gentleman friend, disappointment at her repeated failures to be named to a judgeship and pain with regard to all events following the Singman incident. Most if not all of these events, one may suppose, were part of her autobiographical manuscript and, to give Plaintiff the benefit of the matter for a moment, were presumably portrayed in a fashion reflective of her true feelings. Such information was unquestionably discoverable and relevant to the trial of the case and might have provided a basis for searching cross-examination.

In sum, Plaintiff has asserted serious claims against Defendants who, as professional defenders of the underprivileged and accused, are perhaps more sensitive than most to accusations of the sort Plaintiff has leveled. Yet Plaintiff took it upon herself to assume that Defendants have no right to inquire into her private thoughts on issues that permeate every phase of this case.

 Although the Fourth Circuit does not appear to have addressed the spoliation issue explicitly, it has considered the sanction of dismissal in the context of a party's failure to respond to discovery requests, motions, and orders under Fed.R.Civ.P. 37(d). *See, e.g., Mutual Fed. Sav. & Loan Ass'n*, 872 F.2d at 88. A court's discretion to dismiss a case with prejudice for that sort of discovery abuse is said to be narrow because the court's desire to enforce its orders conflicts with a party's rights to a trial by jury and a fair day in court. *Id.* at 92.

 The court is thus directed to balance these competing interests:

(1) Whether the non-complying party acted in bad faith;

(2) The amount of prejudice the non-compliance caused the adversary, which necessarily includes an inquiry into the materiality of the evidence the party failed to produce;

(3) The need for deterring the particular type of non-compliance; and

(4) The effectiveness of less drastic sanctions. *Id.* Dismissal with prejudice under Rule 37(d) is considered extreme and is reserved "only [for] the most flagrant case, where the party's noncompliance represents bad faith and callous disregard for the authority of the district court and the Rules...." *Id.*

 All the considerations discussed in connection with the Gorelick analysis pertaining to destruction of evidence meet as well the Fourth Circuit's requirements for dismissal based on failure to make discovery. Plaintiff acted in bad faith and callous disregard for the Court and the Rules by destroying evidence that as a litigant and lawyer she knew to be highly relevant to her claim. The prejudice to Defendants, as recited above, was manifest. A less drastic sanction than dismissal with prejudice would hardly do them justice. Finally, the firmest of responses to the misconduct practiced here is necessary to serve fundamental policies of the legal system—truthseeking, fairness, and the integrity of the judicial process. *See generally* Gorelick, *supra* note 6, §§ 1.10–1.13. The Court concludes that by reason of her actions Plaintiff has forfeited her right to continue with the trial of her claim. Accord-

ingly, the Court will enter an order dismissing Plaintiff's suit with prejudice. With regret, the Court is also constrained to refer this matter to the Disciplinary Committee of the Court for possible professional sanctions.[11]

---

11. This statement applies only to Plaintiff, not to her attorneys.