REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 72

September Term, 2015

_____

CUMBERLAND INSURANCE GROUP

v.

DELMARVA POWER, D/B/A
DELMARVA POWER & LIGHT CO.

_____

Hotten,
Berger,
Nazarian,

JJ.

_____

Opinion by Nazarian, J.

_____

Filed: February 1, 2016

*Michele D. Hotten, while still a member of this
Court, participated in the hearing of this appeal
and approved the contents of this opinion but did
not participate in the decision to publish the
opinion.

David Wickwire's house in Hurlock, Maryland sustained major damage from a fire. His homeowner's insurer, Cumberland Insurance Group ("Cumberland"), paid his claim, and came to believe that the fire was caused by faulty wiring in the house's electric meter box. Cumberland seeks subrogation from Delmarva Power ("Delmarva"), Mr. Wickwire's electric company, but the Circuit Court for Dorchester County granted Delmarva's motion for summary judgment on the ground that Cumberland destroyed the fire scene, which deprived Delmarva of the opportunity to investigate or defend the claim. Cumberland appeals, and we affirm.

## I. BACKGROUND

Mr. Wickwire insured his home with Cumberland, and Delmarva provided his electric service. A fire broke out at the house on the morning of May 5, 2013, and local fire department personnel responded and put out the fire. Delmarva also responded by sending a lineman, Jeff Willoughby, to disconnect the power supply to the house, evidently at the request of the fire department. Mr. Willoughby did not serve in any investigative capacity that day[1]; his job was to "make things safe"—*i.e.*, to "[m]ake sure the wire was dead going to the house"—so he "[w]ent to the transformer, figured out which wire went to that house, [and] disconnected it in the transformer . . ."

---

[1] He testified at his deposition to that effect: "I'm not a professional in fires. I don't know where the fire started, how it started."

Thomas Harr, a Senior Deputy State Fire Marshal, investigated the fire, and noted significant smoke and water damage throughout the interior of the house. The worst fire damage was in the utility room: "[t]he ceiling was down and the remains of the rafters were exposed. The roof was consumed above this room extending up to the peak. The wires in this are[a] suffered heavy fire damage." The Fire Marshal concluded that the fire originated in the meter box. He based his conclusion on burn patterns, witness statements, and the heavy fire damage to the meter box (which showed that the contact lugs in the box were loose at the point where they connected with the wire). He removed the meter and meter box from the scene.

Cumberland retained a fire cause and origin expert, Timothy Hattwick, who inspected the property on May 8, 2013, three days after the fire. He walked through the house and took pictures, but he did not take any evidence from the scene.[2] He reasoned from what he saw "that the fire had moved in from the exterior[, and at] that point combining that knowledge or that observation with what I observed on the exterior, I refocused my examination on the exterior as the area of origin." Mr. Hattwick concluded that the fire "originated in the area of the meter." He contacted Fire Marshal Harr and asked him to return to the scene to bring with him the remains of the meter. The Fire Marshal was unavailable, but the two spoke about the investigation. On May 24, 2013,

---

[2] Ironically, he noted why he did not take the electrical distribution panel away: "That would have been premature at that point in time. It would have spoliated the scene."

Cumberland's electrical engineering expert, Michael Wald, also inspected the house and examined the remains of the meter and meter box (or, as he put it, a "paper bag with remains of electrical devices in it").

As the Cumberland investigation proceeded, it does not appear that Delmarva sent any personnel to inspect the property. Nonetheless Cumberland got an estimate for demolition of the property and issued a check to Mr. Wickwire on May 30, 2013, that appeared to include the cost of demolition. The house and its contents were demolished on July 3, 2013. We will discuss in greater detail below what Delmarva knew, and when Delmarva knew anything, about its potential liability and the eventual destruction of the scene. Delmarva concedes in its brief that "Delmarva knew about the fire on May 5, 2013, and knew as early as May 29, 2013 that a claim may at some point be made against it." Beyond that, though, the parties dispute when, if at all, Cumberland notified Delmarva about the fact that the house was to be demolished, and that question underlay Delmarva's motion for summary judgment (the "Motion").

Delmarva filed the Motion in December 2014. Delmarva argued, among other things, that Cumberland destroyed the fire scene and irreversibly crippled Delmarva's ability to mount a meaningful defense. The trial court held a hearing on January 22, 2015; we will detail the dialogue below, but it will suffice for now that the court ruled from the bench after argument and granted the Motion:

> We're here on a motion *in limine* and a motion to compel and a motion for summary judgment. After reviewing the motions, the exhibits attached thereto and the—considering the

arguments of Counsel there is—the Court is going to grant the motion for summary judgment. Specifically without addressing all of the various arguments the argument that *the Court is going to grant summary judgment on . . . the destruction of the house.*

The Court finds that based on the factors in Clumpt v. Krongberg, [sic[3]] which talk[s] about an act of destruction, discoverability of the evidence, an intent to destroy the evidence an occurrence of the act at a time when the filing of a lawsuit is fairly perceived as imminent that [Delmarva] in this case will not have the opportunity or did not have the opportunity to adequately prepare a defense. Their experts did not have an opportunity to review or to examine the house. [Cumberland's] position of we preserved what we thought caused the fire and took a bunch of pictures I'm not persuaded that that actually is fair to [Delmarva] in the preparation and their experts' preparation of their case.

Further I don't find that there was—that in effect what was a constructive notice argument to [Delmarva] carries weight especially in light of the fact that *the demolition had commenced not even sixty days after the fire.* If we were six months out maybe my feelings would be different, but I think due to the close nature I think due to the fact that *there was no correspondence provided that actually in effect what I would say put [Delmarva] on the clock as to the fact that demolition was contemplated within a soon to be time period.* And that, you know, there was correspondence that put them on notice I guess in effect that at some point litigation was being contemplated or that liability was contemplated which is one of the factors. So there was the idea that a lawsuit was imminent but no effort to preserve the evidence that the other side would need to be able to review to have a fair trial and a fair proceeding.

---

[3] Everyone agrees that the trial court was referring to *Klupt v. Krongard*, 126 Md. App. 179 (1999).

4

> So for those reasons the Court grants the motion for summary judgment in favor of Delmarva Power.

(Emphasis added.)

The court entered a written order on January 22, 2015. Cumberland moved for reconsideration on January 30, 2015, and the trial court denied the motion on March 6, 2013. Cumberland filed a timely notice of appeal.

## II. DISCUSSION

The doctrine of spoliation[4] is grounded in fairness and symmetry. Stated simply, a party should not be allowed to support its claims or defenses with physical evidence that it

---

[4] Cumberland presented the issues—all revolving around the issue of spoliation—in its brief as follows:

> 1. Did the lower Court err by granting appellee's motion for summary judgment based on *Klupt v. Krongard*, 126 Md. App. 179 (1999) for the alleged "spoliation" of evidence?
>
> 2. Did the lower Court abuse its discretion by granting appellee's motion for summary judgment based on *Klupt v. Krongard*, 126 Md. App. 179 (1999) for the alleged "spoliation" of evidence?
>
> 3. Did the lower Court abuse its discretion in determining that "spoliation" occurred, where, as here: (1) appellee had knowledge of the existence of the evidence; (2) the evidence was a badly damaged building that could not be preserved indefinitely; (3) appellee inspected the evidence; (4) appellee was on notice of the potential claims against it; (5) appellee had a statutory duty to investigate and report the on the evidence to the PSC; (6) appellee was notified that the evidence (a fire damaged building) would be demolished; (7) certain evidence was removed from the fire scene and preserved by the Fire

5

has destroyed to the detriment of its opponent. In this case, Cumberland controlled the fire scene and informed Delmarva for the purpose of pursuing its subrogation claim, but never told Delmarva of the fire scene's impending destruction. And as a practical matter, this prevented Delmarva (and, perhaps more to the point, its experts) from assessing the causes of the fire first-hand. Cumberland says, correctly, that it preserved the meter box, which was the culprit in its view. But this case is not just about the meter box—it's about the cause of the fire, and specifically whether the cause, whatever it was, was attributable to Delmarva. And the destruction of the scene deprived Delmarva of the opportunity to test Cumberland's hypothesis or establish the possibility that the fire was caused by anything else.[5]

Marshal as part of the investigation, and subsequently preserved by appellant for use in this litigation; (7) [sic] the evidence was not destroyed by appellant; (8) appellant's subrogor notified appellee before demolition work began at the subject property; and (9) there is no showing of bad faith and/or intentional destruction of evidence by appellant?

4. Did the lower Court abuse its discretion by granting summary judgment rather than imposing some lesser sanction, if any, under the circumstances presented by this case?

[5] In addition to responding to the substance of Cumberland's brief, Delmarva filed a motion to strike portions of Cumberland's brief. Delmarva cites Md. Rule 8-504 and argues that Cumberland failed to cite to any part of the record or record extract in its Statement of the Case. We agree that the brief is non-compliant, but opt not to reach this question in light of the outcome on the merits, and we deny the Motion to Strike as moot.

**A.      Standard Of Review.**

Delmarva moved for summary judgment on a variety of grounds, and the circuit court granted the motion as a discovery sanction, so we review its decision through that lens. *See Erie Insurance Exch. v. Davenport Insulation, Inc.*, 659 F. Supp. 2d 701, 702 (D. Md. 2009) (granting summary judgment based on spoliation and dismissing case). We are bound by a trial court's factual findings in the context of discovery sanctions unless we find them to be "clearly erroneous," Md. Rule 8-131(c); *see also Klupt*, 126 Md. App. at 192-93. The trial court has broad discretion to impose sanctions for discovery violations, "and the decision whether to invoke the 'ultimate sanction' [of dismissal] is left to the discretion of the trial court." *Valentine-Bowers v. Retina Grp. of Washington, P.C.*, 217 Md. App. 366, 378 (2014).

Sanctions may be justified even without "'willful or contumacious behavior'" by a party. *Warehime v. Dell*, 124 Md. App. 31, 44 (1998) (quoting *Beck v. Beck*, 112 Md. App. 197, 210 (1996)). We explained in *Sindler v. Litman* that "[o]ur review of the trial court's resolution of a discovery dispute is quite narrow; appellate courts are reluctant to second-guess the decision of a trial judge to impose sanctions for a failure of discovery." 166 Md. App. 90, 123 (2005).

**B.      The Spoliation Doctrine.**

The spoliation doctrine is well-established in Maryland. *See Klupt v. Krongard*, 126 Md. App. 179 (1999). *Klupt* lays out the elements of spoliation (and we look at those elements next), albeit in the context of a willful destruction of documents and recordings

7

unlike anything that occurred here. We have concluded in other contexts that destruction of evidence is not an independent tort that itself gives rise to a cause of action. *See Goin v. Shoppers Food Warehouse Corp.*, 166 Md. App. 611, 613, 619 (2006) (affirming dismissal of plaintiff's claim and declining to recognize a separate cause of action for "[n]egligent and/or reckless spoliation" by the defendant's employee). And we have affirmed a spoliation instruction that permits an adverse inference even without a showing of bad faith. *See Anderson v. Litzenberg*, 115 Md. App. 549, 560 (1997) (permitting a jury instruction stating that "'destruction of evidence by a person gives rise to an inference or presumption unfavorable to [the] spoiler, and . . . if the intent was to conceal the nature of the defect the destruction must be inferred to indicate a weakness in the case'").

But Maryland appellate courts have not established how to apply the spoliation doctrine in the context of a situation, like this one, where the physical object (or in this case, the building) that was destroyed is itself the subject of the case. We look below at how other jurisdictions have applied the doctrine in that context, and we conclude that it is appropriate to balance the degree of fault (or, in some instances, intent) on the part of the spoliator, on the one hand, with the level of prejudice that inures to the defense because the evidence has been destroyed, on the other. If a trial court finds that this balance favors imposing some sort of sanction, the question then becomes what remedy is appropriate and whether a remedy less drastic than dismissal can cure the prejudice to the defendant. *See Adkins v. Wolever*, 554 F.3d 650, 652 (6th Cir. 2009) ("[A] proper spoliation sanction should serve both fairness and punitive functions."); *Vodusek v. Bayliner Marine Corp.*, 71

8

F.3d 148, 156 (4th Cir. 1995) (fashioning a sanction to serve the "purpose[s] of leveling the evidentiary playing field and . . . sanctioning the improper conduct"). It also recognizes the common-sense principle that "one does not ordinarily withhold evidence that is beneficial to one's case." *Anderson*, 115 Md. App. at 562.

### 1. *Klupt*—Establishing when spoliation takes place.

There is no suggestion in this case that Cumberland behaved anything like Mr. Klupt in *Klupt v. Krongard*. That case related to Mr. Klupt's invention of a disposable videocassette and its licensing and production by other companies. 126 Md. App. at 184. A number of corporations and counsel became embroiled in the litigation, and several of Mr. Klupt's one-time business partners sought a declaratory judgment against him and his corporation, claiming that they were defrauded into investing in the manufacture and distribution of his product. *Id.* at 184-85. Mr. Klupt filed a separate action claiming that the plaintiffs and others had conspired to deprive him of the value of the invention, and the actions were consolidated, with Mr. Klupt's claim designated as a counterclaim. *Id.* at 185.

In the course of discovery, the plaintiffs sought all documents between the parties, including any records of phone conversations. It was discovered later that Mr. Klupt had recorded a number of conversations with some of the plaintiffs, but destroyed the tapes— along with memoranda he had written to memorialize their contents—early on in the litigation and after the plaintiffs had sought them in discovery. *Id.* at 188. To make matters worse, he did not admit to the destruction until his deposition three years into the litigation,

9

and after he attempted on numerous occasions to obstruct discovery and evade answering questions seeking such information. *Id.* at 189-90.

The plaintiffs moved to dismiss Mr. Klupt's counterclaim based on "discovery abuse and contempt of court":

> The motion alleged [that] Klupt made surreptitious recordings of telephone conversations from which he made memoranda; he intentionally destroyed the tape recordings; he created dummy versions from the original memoranda; he withheld both the original and dummy memoranda; he falsely affirmed in his deposition that he had produced all documents.

*Id.* at 190. The trial court granted the motion and Mr. Klupt appealed. We began our review of the law by noting that Maryland's discovery rules do not deal separately with the destruction of evidence, but do permit dismissal based on failure to respond to discovery requests. We pointed out that destruction of evidence would render meaningless a discovery request, or render moot an order to compel:

> If dismissal is permissible in those cases, it would seem to be *a fortiori* permissible in a case of destruction of discoverable evidence. *Cf. White v. Office of the Public Defender for the State of Md.*, 170 F.R.D. 138, 148 n. 8 (D. Md. 1997) ("A party who has removed any possibility of warnings by destroying evidence before a court order can be issued cannot in fairness thereby immunize herself from the ultimate sanction of dismissal.").

*Id.* at 194. We concluded first that the Maryland discovery rules would permit sanctions for destruction of evidence. *Id.* at 195-96. But we also looked to cases interpreting analogous federal rules, and found "inherent authority" for the court to regulate discovery.

10

*Id.* at 196-97 (citing *Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 72 (S.D.N.Y. 1991)).

From there, *Klupt* looked at whether the court could impose the sanction of dismissal or was limited to the less severe sanction of permitting the fact-finder to "draw a negative evidentiary inference or presumption against the spoliator." *Id.* at 197. We opted for the former for two reasons. *First*, we pointed out that the *court* (as opposed to a subsequent trier of fact) was in charge of the discovery process, and therefore best suited to fashion a remedy to address a discovery violation, rather than leaving it for a jury at trial. *Second*, we noted that the spoliation doctrine was "flexible and versatile," so it could be perfectly appropriate to permit a sanction of dismissal when such an issue was addressed during discovery, "while the same offense may raise only an evidentiary presumption when dealt with during trial." *Id.* at 198.

We ultimately adopted the test laid out in *White v. Office of the Public Defender*, 170 F.R.D. 138, 147-48 (D. Md. 1997), for determining whether spoliation had occurred:

> (1) An act of destruction;
>
> (2) Discoverability of the evidence;
>
> (3) An intent to destroy the evidence;
>
> (4) Occurrence of the act at a time after suit has been filed, or, if before, at a time when the filing is fairly perceived as imminent.

*Id.* at 199 (quoting *White*, 170 F.R.D. at 147). We approved the trial court's finding that Mr. Klupt had destroyed the tapes, which were discoverable. The trial court found that Mr.

11

Klupt had destroyed them intentionally, although we pointed out that constructive knowledge could also suffice to satisfy this element. *Id.* at 200. Mr. Klupt also destroyed the tapes not just after suit was filed, but possibly months after they had been requested in the course of discovery. We concluded that the trial court's findings were not clearly erroneous, and then addressed the sanction of dismissal. Given that Mr. Klupt acted not just willfully but "contumaciously," deliberately concealing the existence of the tapes, and given the timing of the destruction, we found no abuse of discretion in the trial court's decision to dismiss Mr. Klupt's counterclaims. *Id.* at 203.

### 2. Fault on the part of the spoliating party.

From there, *Klupt* moved on to analyze the appropriate remedy, and held that dismissal was appropriate given Mr. Klupt's behavior, which fell at the far end of the spectrum, where he wasn't just at fault but acted intentionally, with bad faith and ill-will. *Id.* Most plaintiffs probably aren't as brazen as he was—he concealed and lied about the tapes, then destroyed them with a hammer. But *intent* to destroy isn't a prerequisite to a finding of spoliation—courts look as often to *fault*. So, for example, in *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583 (4th Cir. 2001), the United States Court of Appeals for the Fourth Circuit affirmed the District Court's dismissal of a plaintiff's claim against General Motors, noting that "a court must find some degree of fault to impose sanctions." *Id.* at 590. The court noted that bad faith need not be present, and that "even when conduct is less culpable, dismissal may be necessary *if the prejudice to the defendant is extraordinary,*

denying it the ability to adequately defend its case." *Id.* (emphasis added). As the court explained,

> sometimes even the inadvertent, albeit negligent, loss of evidence will justify dismissal because of the resulting unfairness: "The expansion of sanctions for the inadvertent loss of evidence recognizes that such physical evidence often is the most eloquent impartial 'witness' to what really occurred, and further recognizes the resulting unfairness inherent in allowing a party to destroy evidence and then to benefit from that conduct or omission."

*Id.* at 593 (quoting *Kirkland v. New York City Housing Auth.*, 666 N.Y.S.2d 609, 611 (App. Div. 1997)). *Silvestri* balanced the nature of the conduct and the effect of that conduct—a lack of intent could yet be trumped by a high degree of prejudice and still support dismissal. And in the specific context of preservation of a fire scene, the second half of that balancing test becomes more important, *i.e.*, where the defendant's ability to mount a defense can be obliterated by the spoliation of the scene.

Indeed, in *Erie Insurance Exchange v. Davenport Insulation, Inc.*, 659 F. Supp. 2d 701 (D. Md. 2009), the United States District Court for the District of Maryland applied *Silvestri* in a situation similar to this case. After a house fire, the insurer of the home, Erie Insurance Exchange, sued the homebuilder, Builder Services Group ("BSG"), for negligently installing a fireplace. Erie destroyed all physical evidence three months after the fire took place—fully seventeen months before it notified BSG of its subrogation claim. *Id.* at 706. The court read *Silvestri* to impose a two-part "either/or test" that warrants dismissal if (1) "the spoliator's conduct was so egregious as to make forfeiture of its claim

13

an apt remedy" *or* (2) "if the loss of the evidence is so prejudicial that it substantially denies the defendant the ability to defend the claim," *id.* at 707, and the court found both prongs satisfied. *First*, it noted that Erie's conduct justified forfeiture of its claim because it had reports about a viable subrogation claim within weeks of the incident, saw the fireplace as the likely cause, and still did not try to preserve the scene or notify the targets, decisions that could "only be characterized as negligent." *Id. Second*, the court noted that BSG would have conducted a different, and more exhaustive, search of the scene to identify the safety strip that allegedly was responsible for the fire, and that it also was deprived of the chance to investigate other potential defenses either within the fireplace or outside of it, such that BSG "can neither rule out nor advance an electrical theory of causation." *Id.* at 708.

The court also concluded that there was no appropriate sanction short of dismissal. It reasoned that permitting a jury instruction on spoliation still wouldn't "level the playing field," because the record was compiled almost exclusively by Erie. And limiting Erie only to the evidence that survived the fire was "tantamount to a dismissal," because Erie would be left with no expert to support its claim. *Id.*

### 3. Prejudice to the defendant.

*Erie* raises a good question—what puts a case in the dismissal-as-remedy camp versus the jury-instruction-as-remedy camp? The courts that have affirmed dismissals have zeroed in either on a high degree of fault that carries with it intent (Mr. Klupt, for example, bashing the evidence with a hammer and then lying about it) *or* on a high degree of prejudice (the legal impossibility of mounting a defense where the evidence that has been

destroyed lies at the core of the case). *See, e.g.*, *In re Wechsler*, 121 F. Supp. 2d 404, 428 (D. Del. 2000) ("[T]he spoliation inference cannot serve as a substitute for actual evidence." (citations omitted)). In this context, the party seeking sanctions must be able to demonstrate that the destroyed information is truly relevant to its case. *See, e.g.*, *Sampson v. City of Cambridge*, 251 F.R.D. 172, 183 (D. Md. 2008) (denying motion for sanctions because the movant couldn't show that the emails in question "would have produced evidence which a reasonable factfinder could conclude supported her claims"). And prejudice has degrees, ranging "along a continuum from an inability to prove claims or defenses to little or no impact on the presentation of proof." *Rimkus Consulting Grp., Inc. v. Cammarata*, 688 F. Supp. 2d 598, 613 (S.D. Tex. 2010).

### 4. The remedy of dismissal.

As *Wechsler* pointed out, the sanction of imposing an adverse inference at trial "possesses no punitive or deterrent value." 121 F. Supp. 2d at 428. And while the sanction of an adverse inference or jury instruction is an alternative, *Klupt* never suggested that it was an exclusive remedy in any particular factual circumstance. The trial court is vested with broad discretion, and *Klupt* tells us that dismissal is available as a sanction. Courts have not hesitated to dismiss a case when nothing less will do, *see, e.g.*, *Robertet Flavors, Inc. v. Tri-Form Const., Inc.*, 1 A.3d 658 (N.J. 2010); *Ihli v. Lazzaretto*, 864 N.W.2d 483 (N.D. 2015), even when the destruction was simply neglectful, without bad faith. *Fines v. Ressler Enters., Inc.*, 820 N.W.2d 688 (N.D. 2012); *but see Wechsler*, 121 F.2d 404 (D. Del. 2000) (entering "interlocutory finding of liability" against spoliating party attempting

15

to defend a claim, due to prejudice that stemmed from destruction of boat that caused marina fire).

> C. **The Trial Court Properly Applied *Klupt* And Did Not Abuse Its Discretion By Granting Summary Judgment.**

> 1. **Cumberland "destroyed discoverable evidence."**

Although the factual circumstances of this case differ from *Klupt*, we look there first to determine whether Cumberland's actions led to the destruction of discoverable evidence. *First*, there's no doubt that there was an act of destruction. *Second*, the evidence was unquestionably discoverable. *Third*, there was an "intent to destroy the evidence," *Klupt*, 126 Md. App. at 199—we'll talk below about who intended it, but no one mistakenly demolished the fire scene. And *finally*, the destruction took place "when the filing [of suit was] fairly perceived as imminent." *Id.* On that point, the trial court pointed to several factors, most obviously the fact that this suit involved an experienced insurance company that had an expert appear on the scene within days of the fire. *See Allstate Insurance Co. v. Sunbeam Corp.*, 865 F. Supp. 1267, 1278 (N.D. Ill. 1994), *aff'd*, 53 F.3d 804 (7th Cir. 1995) (noting that the doctrine was "especially applicable" to a subrogee insurance company "since it all along intended to proceed in a subrogation suit"). The parties obviously disagree about the degree of discoverability of the "fire scene," and the trial court framed the issue well in the following exchange with counsel for Cumberland:

> [Counsel for Cumberland]: Your Honor, the really major and sole piece of evidence in this case is the meter and the meter box. And that's preserved. And—

16

THE COURT: Well, *as it relates to your case.*

(Emphasis added.)

So although Cumberland sees its case as centering on the meter and the meter box, the destruction of the scene deprived Delmarva of any opportunity to look to other possible causes.[6] *See Hoffman v. Ford Motor Co.*, 587 N.W.2d 66, 71 (Minn. App. 1998) ("[A] fire scene itself is the best evidence of the origin and the cause of a fire," and the fire scene is of "unquestionable relevancy."). That comes up shortly, when we look at the degree of prejudice to Delmarva. But first, we examine the degree of fault on the part of Cumberland.

## 2. Cumberland was at fault for allowing demolition to go forward.

Cumberland was at fault for the destruction of the fire scene, and it cannot defend on the basis that Delmarva had notice. Cumberland points to what were really no more than notices of the *loss* and a *potential claim*, and it attempts to transform them into notices about *destruction of the property*. And an important preliminary point came out at oral argument—counsel for Delmarva explained that the notice it first received, through the employee it dispatched to the fire, informed the company that the Fire Marshal believed the fire to have started in the *meter box*. As counsel explained, and as nobody disputes, the

---

[6] Cumberland might say the evidence goes merely to the box, but its own pretrial motions suggest that there were other theories at play. It filed motions *in limine* to bar information to the effect that a firefighter told a witness that the fire started in the attic, and also to bar testimony that Mr. Wickwire had run all the electricity to the house on his own.

17

meter box is the customer's property and is installed by the customer (presumably through the services of a private electrician). This is distinct from the meter itself, which plugs into the meter box and is the only property of Delmarva's at the home or element that Delmarva controlled. *See* COMAR 20.50.01.03 (defining "electric distribution plant" as "all electric company plant used to distribute electricity to its customers, including covers and protective structures and excluding customer meters and meter enclosures"). This distinction matters, because it means that Delmarva had no reason to believe that it faced liability for the fire based on that report from the scene.

But even putting aside the meter v. meter box distinction, there is no evidence to suggest that Delmarva had reason to think that the *property* was at risk of destruction until it was too late. Cumberland points to two letters it sent notifying Delmarva of its intention to assert a claim, but these miss an important point: these notices said nothing about the fire scene's impending demolition, nor did any of the evidence to which Cumberland pointed in the circuit court. The Fire Marshal, Mr. Wickwire, and Cumberland had identified Delmarva as a potential target of liability—Delmarva doesn't dispute that it knew of the possibility of a claim as early as May 29, 2013. But knowing that a claim could potentially be filed didn't give Delmarva any reason to think anything one way or the other about the (non)preservation of the scene. And the only Delmarva employee at the scene, Mr. Willoughby, simply turned off the electrical supply to the house.

Cumberland also pointed to notes memorializing some conversation between the homeowner and Delmarva, but these also are silent about the imminent demolition of the

property. While Delmarva does have one record suggesting that Mr. Wickwire asked about demolition—that he "needed info on demo"—the circuit court correctly declined to surmise anything from this about the schedule for the demolition. And although another Delmarva note says that "claimant wants to turn garage into new living space but with no cost due to our fault," it would take a tremendous inferential leap for Delmarva to conclude from there that destruction of the property was imminent.

Cumberland's counsel's written correspondence did not even hint at destruction of the scene. The primary purpose of the June 4, 2013 letter[7] appears to have been to put Delmarva on notice that it could be responsible for the fire and, ironically, to ensure that *Delmarva* not destroy any items relating to the scene:

> We wish to cooperate with your company in the investigation of this loss, and especially regarding preserving and inspecting all items retained from the scene. It is in this connection that I am contacting you, and looking for your company and/or its insurance company to likewise cooperate in the investigation process. Furthermore, *to the extent that your company is in possession of, or is otherwise aware of, any items retained from this scene, or otherwise potentially relevant to this matter (including physical materials as well as electronic and hardcopy documents), I must insist that such items/ materials/documents be preserved unaltered so that my client's representatives may examine and/or test them.*

(Emphasis added.)

---

[7] The fact that Cumberland sent the June 4 letter to five different corporate addresses doesn't cure the problem, *i.e.*, that the letters never mention the possibility or timing of the demolition.

If anything, *Cumberland* knew that demolition was imminent—the check it issued to Mr. Wickwire covered an estimate for demolition. And then, once demolition had begun, Cumberland sent a second letter on July 3, 2013, in which it casually mentioned that demolition had begun:

> We advised that we intended to pursue recovery from the parties responsible for the subject fire. We believe that your company is responsible for the subject fire and the resultant damages. You failed to respond to our prior correspondence, *in which we offered to make the subject premises available for your inspection. While you waived your rights to inspect the premises (demolition has begun) we have preserved those items identified as the cause and origin of the subject fire.* If we do not receive a response to this letter within fourteen (14) days of the above date, then we will be left with no choice but to take appropriate action without further notice.

(Emphasis added.) And while it's true that Cumberland did not directly engineer the demolition, it was heavily involved in, aware of, and financed the process that Mr. Wickwire put into place.[8] The circuit court did not resolve a dispute of fact—it found, from the undisputed paper trail, that Delmarva did not have an opportunity to prepare a defense.

### 3. Delmarva's defenses were fatally prejudiced, and dismissal was the appropriate remedy.

Delmarva's two defense experts, Christoph Flaherty and Walter Rothfuss, prepared a report dated October 5, 2014, that opined that the fire "originated in the attic and was

---

[8] We don't address here whether fault would still be imputed to Cumberland had it not been so closely involved in that process.

20

electrical." When Cumberland's expert, Michael Wald, responded to the October 5 Report in his deposition, he attacked their opinions as "speculation and conjecture," thereby (if unwittingly) highlighting the prejudice to Delmarva:

> Q. What opinions do you have in response to the defense report?
>
> A. Where do I . . . start? That report appears to be a fire report, a fire origin and cause report. It opines at the end on the area of origin and the cause. In no place in that report does it state that either Mr. Rothfuss or Mr. Flaherty examined any of the site, examined any of the components other than the ones that are in the possession of Mr. Wald.
>
> *It opines that there was a circuit, a branch circuitry failure in the attic. Yet it does not say what branch circuit or where it failed.* The attic is pretty big on that house in those terms. It doesn't say what caused the failure. *It doesn't list a specific point of origin. Because they did not get an opportunity or did not examine the area below the meter outside the house, their theory of drop down is just a hypothesis. It does not stand up to questioning.*
>
> So there are many factors in that report that are speculation or conjecture. Therefore, they cannot make a definitive origin and cause determination. *They can certainly offer one idea as to what happened, but that would not be a definitive origin and cause report that met the [applicable] standards.*
>
> Q. And why is that?
>
> A. *For everything I just said. They did not examine the physical evidence, except for the meter. They did not go to the scene. They have a theory that the fire damage on the exterior was caused by drop down, yet they did not examine the area beneath the soffit, which I did*; and as I characterized earlier, it did not have a fuel load or a fuel package that was consistent with the damage that we saw on the exterior or with the ability

21

to set that fire at the back of the house—or I'm sorry, to have done that damage to the meter.

*At the same time, they did not examine, to my knowledge, the branch circuits, with the exception of looking at photographs.* In one particular area I think Mr. Rothfuss, if I'm correct, makes the statement that the wires are pulled, which is the result of resistance heating. I don't know how he can make that statement because the wires could have done that from heating from the fire as well. So it could be external fire. *Again, they do not offer succinct facts for their conclusions. They offer speculation and conjecture.*

Q. In your experience if an expert doesn't review the physical evidence but only photographs, is his opinion not compliant with 921?

A. That's not always the case. There are times when a—the body of physical evidence may be such that a case review could allow an investigator to render an opinion. In this particular instance, I don't believe that is the case.

Q. Why is that?

A. *They simply do not have enough to review. They would have had to have been at the site. They would have had to have looked at the ground, the damage to the rear.*

In addition to examining the interior of the panel box, he makes the statement that the breakers tripped because of short circuiting. You can't know that without examining the breakers. Heat can cause the breakers to trip as well, which is most likely what happened in this instance.

(Emphasis added.)

Mr. Hattwick's testimony proves the point. Delmarva's experts' theory was flawed because they did not perform a thorough investigation of the fire scene. But they didn't perform a thorough investigation because they couldn't do so once the house had been

22

demolished. On the other hand, Mr. Hattwick had the opportunity to take in the full scene and draw his own independent conclusions about the area of origin. The defense, and especially its experts, never had the opportunity affirmatively to rule in or rule out the other parts of the house as the area of origin, which irreparably prejudiced their ability to defend, and which made dismissal altogether appropriate.

We disagree that *Charter Oak Fire Insurance Co. v. Marlow Liquors, LLC*, 908 F. Supp. 2d 673 (D. Md. 2012), compels a different result. There, the insurer-subrogee filed suit against an electrician (among many others) claiming that his installation of undersized meter conductors caused a fire in several businesses in a shopping center. *Id.* at 677. The electrician sought summary judgment based on various parties' failure to preserve circuit breaker panels from the fire. The trial court denied the motion, applied the *Silvestri* analysis, and found that certain parties had "willfully discarded" relevant evidence. *Id.* at 683-84. But when it came to the electrician's ability to prepare a defense, his spoliation motion broke down:

> [The electrician] can defend this case without the missing evidence. As noted, his expert . . . opined that the most likely cause of the fire was an electrical failure in [the power company's] metering equipment. *[The expert] does not rely on the [destroyed evidence]*. [A second expert] also points to an electrical fault within the meter base and cabinet [and] identified multiple potential sources of this electrical fault, all of which exculpate [the electrician], and *none of which requires the [destroyed evidence] in order to be persuasive*.

23

*Id.* at 685 (emphasis added). The same can't be said here, where the experts were left with no evidence to rule out or rebut *any* of Cumberland's theories.[9] And importantly, that the trial court in *Charter Oak* reached a different, more lenient result does not mean that the trial court abused its discretion for deciding not to fashion that same result.

**JUDGMENT OF THE CIRCUIT COURT FOR DORCHESTER COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

---

[9] While barring the testimony of a plaintiff's expert could conceivably be considered a "more lenient" sanction than dismissal, it would have the same result here. Barring Cumberland's experts would have left it with nothing to establish the elements of its claim in any event, and would be "tantamount to a dismissal" of Cumberland's case. *See Erie*, 659 F. Supp. 2d at 708; *Unigard Sec. Insurance Co. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d 363, 369 (9th Cir. 1992) (granting summary judgment following exclusion of experts given spoliation of relevant evidence); *see also Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 79 (3d Cir. 1994) (where circular saw case involved allegation of a design defect—which would have been inherent in all saws of a particular model—rather than a manufacturing defect—which would have been present only in the saw at issue—the prejudice to defendant was not extreme because the "need for immediate access to the particular saw involved in the accident was greatly diminished").