*Adventist Healthcare, Inc., et al. v. Susan M. Mattingly*, No. 2104, Sept. Term 2018. Opinion filed on January 29, 2020, by Berger, J.

## SPOLIATION

The lawful cremation of a family member's remains is not an "act of destruction" in the spoliation context, nor did a mother's decision to cremate her son's remains evince an intent to destroy evidence.  When an individual who has authority to make decisions about the appropriate disposition of a decedent's remains chooses to obtain a private autopsy and subsequently have the remains cremated, the person with authority has no duty to preserve evidence from the body, nor does the person with authority have an obligation to permit other individuals to participate in the autopsy.  When a person authorized to have a decedent's remains cremated chooses to do so without having informed potential defendants in a subsequent medical malpractice case, the authorized person has not engaged in spoliation.

## MEDICAL MALPRACTICE - EXPERT TESTIMONY - CAUSATION

In medical malpractice cases, expert testimony is generally required to establish a breach of the standard of care and causation.  In this case, no single witness testified that a nurse's breach of the standard of care caused the decedent's death, but the expert testimony of a nursing expert and a surgeon expert, when considered together and in conjunction with other evidence presented at trial, was sufficient to establish the element of causation and permit the claim to go to the jury.

Circuit Court for Prince George's County
Case No. CAL15-26424

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2104

September Term, 2018

_____

ADVENTIST HEALTHCARE, INC., ET AL.

v.

SUSAN M. MATTINGLY

_____

Berger,
Arthur,
Woodward, Patrick L.
       (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Berger, J.

_____

Filed:  January 29, 2020

 Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

This is an appeal of a jury verdict in a medical malpractice case from the Circuit Court of Prince George's County. James Thomas Mattingly, Jr., ("Mr. Mattingly") died on August 5, 2014, five days after a surgical procedure to reverse his colostomy. The surgery was performed by Dr. Sarabjit S. Anand, M.D. ("Dr. Anand") at Washington Adventist Hospital in Takoma Park, Maryland on July 31, 2014. Mr. Mattingly remained hospitalized following the July 31, 2014 surgery until his death.

Mr. Mattingly's mother, Susan Mattingly ("Ms. Mattingly"), filed the claim that gave rise to this appeal, both individually and as Personal Representative of her son's estate, against Dr. Anand and Adventist Healthcare, Inc. d/b/a Washington Adventist Hospital ("WAH") (collectively, the "Appellants"). Ms. Mattingly brought both wrongful death and survival claims. Ms. Mattingly alleged, *inter alia*, that Dr. Anand breached the standard of care by failing to timely diagnose and treat a bowel leak after the surgery, which ultimately caused infection and sepsis, resulting in Mr. Mattingly's death.[1] Ms. Mattingly further claimed that a nurse employed by WAH, Adebusola Matilukuro ("Nurse Matilukuro") was negligent for failing to escalate the issue pursuant to hospital policy after Dr. Anand failed to respond to multiple telephone calls on the morning of August 5, 2014, while Mr. Mattingly became progressively more ill.

The case proceeded to trial and the jury returned a verdict in favor of Ms. Mattingly and against both WAH and Dr. Anand. Both WAH and Dr. Anand noted timely appeals.

---

[1] Ms. Mattingly further alleged that Dr. Anand breached the standard of care by ordering Milk of Magnesia for Mr. Mattingly after his surgery. This issue is unrelated to the issues on appeal.

Both WAH and Dr. Anand raise appellate issues relating to alleged spoliation of evidence by Ms. Mattingly.[2]  Specifically, the Appellants assert that Ms. Mattingly engaged in spoliation of evidence by having her son's remains cremated after obtaining a private autopsy.  The Appellants present the following appellate issues:

>     I.    Whether the circuit court erred by denying the Appellants' Motion for Summary Judgment and

---

[2] We have rephrased the issues presented by the Appellants for clarity.  The questions, as presented by appellant Dr. Anand, are:

>     1.    Was the trial court's failure to exercise discretion in refusing to sanction Appellee for spoliation of evidence an abuse of discretion warranting reversal?
>
>     2.    Did Appellee's destruction of Mr. Mattingly's body amount to spoliation of key evidence?
>
>     3.    Did the trial court err in failing to sanction Appellee for the discovery violation caused by Appellee's spoliation of the evidence?
>
>     4.    Did the trial court err in refusing to instruct the jury on spoliation of evidence?

The appellate issues, as presented by appellant WAH, are:

>     1.    Whether this Appellant was entitled to judgment in a complex medical malpractice action involving allegations of nursing negligence in the care and treatment of a post-surgical patient where Plaintiff failed to produce any expert testimony on the issue of causation.
>
>     2.    Whether the trial court erred in denying the Motions to Dismiss of the Appellants on the basis of spoliation of evidence.
>
>     3.    Whether the trial court erred in denying the requests of the Appellants for a jury instruction regarding spoliation of evidence.

2

Motions for Judgment on the basis of spoliation of evidence.

II. Whether the circuit court erred by denying the Appellants' request for a jury instruction regarding spoliation of evidence.

In addition, WAH raises one individual appellate issue and joins other arguments made by Dr. Anand. WAH's individual appellate issue is:

III. Whether the circuit court erred by failing to grant WAH's motion for judgment on the basis that Ms. Mattingly failed to present expert testimony on the issue of whether Nurse Matilukuro's breach of the standard of care caused Mr. Mattingly's death.

We shall hold that the cremation of Mr. Mattingly's remains did not constitute spoliation. Accordingly, we shall hold that the circuit court appropriately denied the Appellants' motion for summary judgment and motions for judgment on this issue. We shall further hold that the circuit court did not abuse its discretion by declining to propound a jury instruction on spoliation. In addition, we shall hold that the circuit court did not err by denying WAH's motion for judgment on the causation issue. Accordingly, we shall affirm.

**FACTS AND PROCEEDINGS**

In March 2014, Mr. Mattingly presented at WAH with complaints of abdominal pain. He was diagnosed with diverticulitis and a perforated colon.[3] On March 11, 2014,

---

[3] "Diverticula are small, bulging pouches that can form in the lining of [the] digestive system. They are found most often in the lower part of the large intestine (colon). Diverticula are common, especially after age 40, and seldom cause problems. Sometimes, however, one or more of the pouches become inflamed or infected. That condition is known as diverticulitis . . . Diverticulitis can cause severe abdominal pain, fever, nausea and a

3

Mr. Mattingly had a sigmoid colectomy and colostomy.[4]  On July 31, 2014, Mr. Mattingly had a surgical procedure to reverse the colostomy.  During the colostomy reversal surgery, the two disconnected sections of Mr. Mattingly's colon were rejoined by sewing them back together, which is known as an anastomosis.

A risk of colostomy reversal surgery is that a patient can develop a leak at the anastomosis, known as an anastomotic leak.  The likelihood of an anastomotic leak is between three and eight percent.  Because of this risk, patients are observed carefully in the hospital for a period of time following the surgery.  During the days following the colostomy reversal surgery, Mr. Mattingly appeared to be progressing normally in his recovery.  Dr. Anand was involved with Mr. Mattingly's post-operative care and saw Mr. Mattingly several times while he remained in the medical-surgical unit at WAH.

During the late night and early morning hours of August 4-5, 2014, Mr. Mattingly's condition deteriorated.  Mr. Mattingly informed nurses overnight that he was in pain.  At approximately 5:30 a.m. on August 5, Mr. Mattingly telephoned his mother, Ms. Mattingly.  Mr. Mattingly was very upset and was "screaming" and "telling [her] he was dying."  Mr. Mattingly asked his mother to get to the hospital as quickly as possible.

---

marked change in . . . bowel habits."  Mayo Clinic, Patient Care & Health Information, Diseases & Conditions: Diverticulitis, available at https://www.mayoclinic.org/diseases-conditions/diverticulitis/symptoms-causes/syc-20371758, last visited Oct. 28, 2019.

[4] A colectomy is a surgical procedure to remove all or part of the colon.  A colostomy is a surgical procedure in which the colon is attached to an opening created in the abdomen which allows waste to leave the body through the opening.  A colostomy can be permanent or temporary.  Mayo Clinic, Patient Care & Health Information, Tests & Procedures: Colectomy, available at https://www.mayoclinic.org/tests-procedures/colectomy/about/pac-20384631, last visited Oct. 28, 2019.

Ms. Mattingly arrived at WAH at approximately 6:45 a.m. and went straight to Mr. Mattingly's room. She observed him "panting" and "breathing really heavy." At one point, Mr. Mattingly poured a pitcher of ice water over his head and began vomiting bile. Ms. Mattingly reported Mr. Mattingly's distress to the nurses, and the nurses attempted to reassure Ms. Mattingly and calm her down.

At approximately 7:00 a.m., Nurse Matilukuro took over the care of Mr. Mattingly as his "day shift" nurse. She was informed by the overnight nurse that Mr. Mattingly had been complaining of pain. Nurse Matilukuro evaluated Mr. Mattingly and observed that his stomach was distended and tender to the touch. This did "not look[] normal" for a post-operative patient, so Nurse Matilukuro telephoned Dr. Anand. Nurse Matilukuro informed Dr. Anand that Mr. Mattingly's abdomen was distended and tender to the touch and that Mr. Mattingly was experiencing pain. She further informed Dr. Anand that Mr. Mattingly's abdomen was firm and that he had complained of shortness of breath. Dr. Anand ordered a STAT x-ray for Mr. Mattingly and told Nurse Matilukuro that Mr. Mattingly should have nothing by mouth except for ice chips.[5]

Dr. Anand testified at trial about Nurse Matilukuro's approximately 7:00 a.m. telephone call. He recalled being told of Mr. Mattingly's abdominal distension and pain. Dr. Anand found the distension concerning. Dr. Anand had seen Mr. Mattingly the prior evening and his symptoms of pain and distension were, in Dr. Anand's words, a "sudden change" from the prior day. Dr. Anand was concerned that Mr. Mattingly could have some

---

[5] A STAT order is an order to be done immediately.

5

type of obstruction or other bowel issue. Dr. Anand explained that various issues could cause Mr. Mattingly's symptoms, including "worsening ileus, stomach distension, small bowel distension and other things related to an anastomosis." Dr. Anand explained that the "worst first" possibility of the potential diagnoses was a leaking anastomosis that could constitute a medical emergency. Dr. Anand acknowledged that a leaking anastomosis would allow bacteria to leak into the peritoneal cavity, which causes sepsis and potentially death if untreated.

Nurse Matilukuro entered the order for a STAT abdominal x-ray at approximately 7:30 a.m. At approximately 8:00 a.m., Nurse Matilukuro telephoned Dr. Anand again. She asked Dr. Anand when he would be coming in and advised Dr. Anand that Ms. Mattingly was upset and asking for Dr. Anand. Nurse Matilukuro further advised Dr. Anand that Mr. Mattingly had not been taken for his x-ray yet. Dr. Anand told her that "he was coming" and "on the way." At 8:05 a.m., Mr. Mattingly was showing abnormal vital signs, including a high respiratory rate, labored breathing, elevated body temperature, high peripheral pulse rate, and low blood pressure.

Nurse Matilukuro placed another telephone call to Dr. Anand at approximately 9:00 a.m. Dr. Anand told Nurse Matilukuro again that he was on his way. Nurse Matilukuro transferred the call to Ms. Mattingly so that she could speak directly to Dr. Anand. Ms. Mattingly told Dr. Anand about Mr. Mattingly's symptoms, including that Mr. Mattingly was having trouble breathing, panting, and suffering from "a lot of pain." Ms. Mattingly

6

told Dr. Anand that Mr. Mattingly had vomited and that his blood pressure was "very low."[6] Ms. Mattingly was "really concerned" because "[t]hings kept getting worse and worse" and she "kn[e]w low blood pressure is not good." Dr. Anand told Ms. Mattingly, "I will be there at 10:00 to see you."

Mr. Mattingly was taken for his x-ray at approximately 9:20 a.m. When he returned to his room approximately thirty minutes later, he was "in bad shape" and "could hardly breathe." Mr. Mattingly sat in the chair in his room while Ms. Mattingly remained with him. Mr. Mattingly was unable to lie down because it caused him additional difficulty breathing. While Mr. Mattingly and his mother were talking, Ms. Mattingly saw Mr. Mattingly stop breathing. Mr. Mattingly began foaming at the mouth and his eyes rolled back. Ms. Mattingly called for the nurse. Nurse Matilukuro came into the room and observed that Mr. Mattingly was unconscious. At 10:49 a.m., the Rapid Response Team was called and a Code Blue was activated. The code team quickly came into Mr. Mattingly's room and attempted to revive Mr. Mattingly.

A hospitalist physician telephoned Dr. Anand, who had still not yet arrived at the hospital, to inform him that Mr. Mattingly had "coded."[7] The same hospitalist physician had seen Mr. Mattingly in the hallway when he was waiting for his x-ray and had observed

---

[6] Ms. Mattingly testified that she saw the blood pressure reading when Mr. Mattingly's vitals were taken and the blood pressure reading was "very low . . . 70 over 50 or something like that."

[7] A hospitalist is a physician who specializes in providing and managing the care and treatment of hospitalized patients. Hospitalist, Merriam-Webster, http://www.merriam-webster.com/dictionary/hospitalist.

7

Mr. Mattingly in apparent distress, which the hospitalist found concerning. Dr. Anand told the hospitalist that he was on his way. Mr. Mattingly could not be revived and was pronounced dead at 11:09 a.m. Dr. Anand did not arrive at the hospital until after Mr. Mattingly had died. Ms. Mattingly recalled that Dr. Anand came into the room at approximately 11:30 a.m. Dr. Anand told Ms. Mattingly, "I'm sorry. This never should have happened."

After Mr. Mattingly's death, Ms. Mattingly wanted an autopsy to be performed in order to learn the cause of death. Because of the circumstances surrounding Mr. Mattingly's death, Ms. Mattingly "was leery" and "didn't trust anybody." She "wanted an honest opinion as to what happened and . . . was afraid [she] wouldn't get [an honest opinion] from [WAH]." A request for an autopsy was made to the Office of the Chief Medical Examiner for the State of Maryland, but the request was denied. Ultimately, a private autopsy was arranged through Ms. Mattingly's attorney. The autopsy was performed at a funeral home by autopsy technician Donnell McCullough and pathologist Edward Reedy, M.D.[8]

---

[8] Mr. McCullough is trained in mortuary science and has worked for the Office of the Chief Medical Examiner for the State of Maryland for approximately twenty-nine years as the autopsy service supervisor. Mr. McCullough explained that in this role, he is responsible for the day-to-day operations at the office. In addition, he worked for a separate company that performed private autopsies. Mr. McCullough estimated that he had participated in private autopsies for hundreds of families in addition to the "thousands" of autopsies in which he has participated with the Office of the Chief Medical Examiner. Mr. McCullough procured a pathologist, Dr. Reedy, to participate in the autopsy. Mr. McCullough knew Dr. Reedy because Dr. Reedy had trained in the Office of the Chief Medical Examiner.

Mr. McCullough and Dr. Reedy performed the autopsy "blindly" in that they had no medical records and were asked to make independent findings. They did not know that any medical malpractice had been alleged in connection with Mr. Mattingly's death and did not know that Dr. Anand or any other particular medical professional was involved. Mr. McCullough testified that this "blind fashion" is a typical way to perform an autopsy.

During the autopsy, Mr. McCullough and Dr. Reedy created an incision into Mr. Mattingly's abdomen and immediately observed a large amount of "milky, bloody looking fluid" which appeared abnormal and had a "foul odor" that "smelled like feces."[9] They observed blood clots on top of the intestines and removed the organs, which is typically done during an autopsy. Small pieces of tissue were cut from the organs, placed in stock jars, and preserved in formaldehyde. The anastomosis was preserved as well. Mr. McCullough explained that this is the "normal procedure during any autopsy" and that "[t]he same procedure takes place" for autopsies performed by the Chief Medical Examiner for the State of Maryland. He further explained that at the Office of the Chief Medical Examiner, the stock jars were kept in a ventilated room with metal shelves, but that for private autopsies, the stock jars cannot be stored at the State facility. Mr. McCullough testified that he had a similar ventilated room in his home where he would store samples from private autopsies, including those from Mr. Mattingly's autopsy. Mr. McCullough testified that photographs were taken during the autopsy following the same procedure utilized at the Office of the Chief Medical Examiner. The autopsy was not videotaped.

---

[9] At times during his testimony, Mr. McCullough did not specify which tasks during the autopsy were performed by himself and which by Dr. Reedy.

Mr. McCullough testified that, to his knowledge, WAH and Dr. Anand were not advised that the autopsy was going to be performed. Mr. McCullough testified that sometimes autopsies are videotaped if he is told in advance that it was a medical malpractice case, but that in this case he was unaware in advance that the autopsy was related to allegations of medical malpractice. After the autopsy was completed, the organs were returned to the body. Ms. Mattingly subsequently chose to have Mr. Mattingly's remains cremated.

The complaint that ultimately gave rise to this appeal was filed in the circuit court on September 8, 2015, and discovery ensued. Prior to trial, Dr. Anand moved for summary judgment. In support of his motion for summary judgment, Dr. Anand asserted that Ms. Mattingly engaged in spoliation of evidence by procuring a private autopsy and subsequently cremating Mr. Mattingly's remains. Specifically, Dr. Anand emphasized that the Appellants were not permitted to observe the autopsy, the autopsy was not videotaped, the abdominal fluid was not tested, and the body was cremated. The circuit court denied the motion for summary judgment, explaining that the concerns raised about the autopsy went to its "weight and credibility" and were "[j]ury issues."

At trial, Ms. Mattingly presented the testimony of pathologist Stuart Graham, M.D.[10] In preparation for his testimony, Dr. Graham read and reviewed Mr. Mattingly's medical records, slides that had been prepared from the tissue samples removed during the autopsy, autopsy photographs, an autopsy report and amended autopsy report prepared by

_____

[10] Dr. Reedy did not testify at trial.

10

Dr. Reedy, and transcripts of depositions including those of Dr. Reedy, Mr. McCullough, Dr. Anand, and Nurse Matilukuro. Dr. Graham testified, to a reasonable degree of medical certainty, that Mr. Mattingly "died, without question, due to a failed surgical anastomosis or surgical joining of his sigmoid colon and rectum."

Dr. Graham explained that the "failure of the joining or anastomosis allowed the contents of his bowel, his stool to escape into his peritoneal cavity" which "caused an infection, which was clearly fatal." Dr. Graham explained that "this case [was] so straightforward" because of "the presence of . . . 51 ounces of cloudy, bloody, dark fluid" in Mr. Mattingly's peritoneal cavity. Dr. Graham further testified that he had reviewed autopsy photographs as well as the preserved anastomosis itself, both of which showed "a gaping hole" of "about five millimeters" in the anastomosis. Based on his evaluation, Dr. Graham concluded that the defective anastomosis occurred prior to Mr. Mattingly's death.

Dr. Graham could not identify precisely when the leakage began. He concluded, however, that the "leakage was certainly going on for several hours" before Mr. Mattingly's death. Dr. Graham explained that "it would take hours and hours" for "1500cc or 51 ounces of this fluid to leak out of a hole . . . smaller than a fourth of an inch."

When asked whether there would have been any reason for blood samples to be taken during an autopsy, Dr. Graham testified that there was no "conceivable use for performing any tests on blood in a decedent who has died with the circumstances and findings that are known in this case." Dr. Graham again emphasized that "the cause of death [wa]s certain" in that Mr. Mattingly's death was caused by "a defect in a surgical anastomosis which result[ed] in 1500cc or 51 ounces of fluid leaking" which caused

11

"terminal septic shock associated with that defect." Dr. Graham testified that under these circumstances, there was "no need or use" for blood or tissue testing. With respect to Mr. Mattingly's life expectancy, Dr. Graham testified that, despite Mr. Mattingly's co-morbidities, he would have lived for "a couple of decades" if he had not suffered from septic shock caused by the leaking anastomosis.

Ms. Mattingly presented expert testimony on the surgical standard of care and causation from Peter Jackson, M.D., Chief of General Surgery at Georgetown University Hospital. Dr. Jackson opined that Mr. Mattingly "died of septic shock" caused by "an anastomotic leak from his colon." Dr. Jackson testified that, in his expert opinion, Dr. Anand breached the standard of care by failing to promptly and properly respond to telephone calls he received from nursing staff on the morning of August 5, 2014. Dr. Jackson further testified that "a leaking anastomosis with feculent stool pouring into [the] abdominal cavity is a surgical emergency" that "require[s] an immediate operation."

Dr. Jackson testified that there are steps that Dr. Anand could have taken before he even arrived at the hospital, explaining that Dr. Anand could have contacted an on-call physician at the hospital. With respect to timing, Dr. Jackson testified that after receiving a telephone call at approximately 7:00 a.m., an x-ray should have been done by 7:30 a.m., an examination should have been performed by 8:00 a.m., and "the operation starts at least by 9:00 a.m." Dr. Jackson testified that in a surgical emergency like this, "you should be in the operating room within the hour." Specifically, Dr. Jackson testified that, by 9:00 or 10:00 a.m., Mr. Mattingly should have been taken to surgery, where his incision should have been re-opened, the abdomen should have been washed, and a new colostomy should

12

have been performed. Dr. Jackson testified, to a reasonable degree of medical probability and certainty, that if the operation had been performed by 9:00 a.m. on August 5, 2014, Mr. Mattingly would still be alive. Dr. Jackson testified similarly that Mr. Mattingly would still be alive if the operation had been performed by 10:00 a.m.

The jury further heard expert testimony from Allison Cable ("Nurse Cable"), a Yale University nurse who testified as to whether Nurse Matilukuro breached the standard of care by failing to properly escalate the situation with Mr. Mattingly by timely calling the Code Blue Team or Rapid Response Team pursuant to WAH Chain of Command policy. Nurse Cable testified that it was her expert opinion that Nurse Matilukuro should have invoked the Rapid Response Team by 8:30 a.m. due to Mr. Mattingly's shortness of breath, abdominal pain, sweating, and "extremely concerning" vital signs.

The Appellants moved for judgment on the basis of spoliation at the close of Ms. Mattingly's case and again at the close of evidence. In addition, WAH moved for judgment at the close of Ms. Mattingly's case and again at the close of evidence on the basis that Ms. Mattingly failed to present expert testimony on the issue of causation as to the claim against WAH premised upon Nurse Matilukuro's negligence. The circuit court denied the motions. The Appellants requested that the trial court instruct the jury on spoliation, but the circuit court declined.

The jury returned a verdict in favor of Ms. Mattingly against both Appellants and awarded damages in the amount of $1,350,000.00. The verdict was reduced pursuant to the statutory cap on non-economic damages to $740,000. Judgment was entered jointly and severally against both Appellants. The Appellants filed Motions for Judgment

13

Notwithstanding the Verdict and Motions for a New Trial which were denied by the circuit court. This appeal followed.

Additional facts shall be set forth as necessitated by our discussion of the issues on appeal.

## DISCUSSION

## I.

The Appellants assert that the circuit court erred and/or abused its discretion by failing to grant their motion for summary judgment and motions for judgment on the issue of spoliation, as well as by failing to propound a jury instruction on spoliation. Accordingly, the first critical inquiry we must undertake is a determination of whether Ms. Mattingly's decision to obtain a private autopsy and subsequently have her son's remains cremated constituted spoliation. We shall hold that it did not.

First, we set forth the applicable standards of review for the Appellants' claims. Generally, the circuit court has broad discretion to regulate discovery, including when addressing allegations of spoliation. *Klupt v. Krongard*, 126 Md. App. 179, 192 (1999). "[W]e are bound to the court's factual findings unless we find them to be 'clearly erroneous.'" *Id.* (quoting Md. Rule 8-131(c)). "Our review of the trial court's resolution of a discovery dispute is quite narrow; appellate courts are reluctant to second-guess the decision of a trial judge to impose sanctions for a failure of discovery." *Id.* at 193. "We review the decision to grant or deny a motion for judgment (in whole or in part) *de novo*." *DeMuth v. Strong*, 205 Md. App. 521, 547 (2012).

14

Critically, although appellate courts defer to the trial court's factual findings unless clearly erroneous and review the determination of an appropriate discovery sanction for abuse of discretion, we undertake an independent analysis of purely legal issues. *State v. Robertson*, 463 Md. 342, 351 (2019) ("Errors of law and purely legal questions are reviewed de novo and [appellate courts] afford[] no deference to the decision of the court below."). Appellate courts, therefore, undertake an independent analysis of whether spoliation occurred as a matter of law. *See*, *e.g.*, *Cumberland Ins. Grp. v. Delmarva Power*, 226 Md. App. 691, 705-06 (2016).

Spoliation is a doctrine "grounded in fairness and symmetry." *Id.* at 696. The doctrine is premised upon the principle that "a party should not be allowed to support its claims or defenses with physical evidence that it has destroyed to the detriment of its opponent." *Id.* at 696-97. When determining whether spoliation has occurred, a court considers whether there has been an act of destruction, whether the destroyed evidence was discoverable, whether there was an intent to destroy the evidence, and whether the destruction occurred at a time after suit has been filed, or, if before, at a time when the filing was fairly perceived as imminent. *Id.* at 701-02.

The Appellants assert that there was "a clear act of destruction" when "Ms. Mattingly took possession of Mr. Mattingly's body after his death, conducted a private autopsy and had the body cremated, all without any notice to" the Appellants. Ms. Mattingly asserts that there was no act of destruction. Rather, Ms. Mattingly asserts, she sought an autopsy to establish a cause of death and, after the autopsy was completed, she made appropriate final arrangements for her son's remains.

There are no Maryland cases directly addressing whether the cremation of a family member's remains can constitute spoliation in the context of a medical malpractice lawsuit. The Appellants attempt to analogize this case with our decision in *Cumberland*, *supra*, in which we addressed a spoliation claim in a case arising from a dispute about the cause of a house fire and the subsequent demolition of the house where the fire occurred. A homeowner's house sustained major damage from a fire, and the homeowner's insurer sought subrogation from the power utility because the insurer believed that the fire was caused by faulty wiring in the house's electric meter box. 226 Md. App. at 691. The Fire Marshal concluded that the fire originated in the meter box, and the insurer retained a fire cause and origin expert, who inspected the property. *Id.* at 694. The expert also concluded that the fire "originated in the area of the meter." *Id.* The damaged meter and meter box were retained, but after the insurer issued the homeowner a check to cover the costs of demolition, the house and its contents were subsequently demolished. *Id.* at 695.

Litigation ensued, and the utility moved for summary judgment on the basis that the demolition of the property "irreversibly crippled" the utility's "ability to mount a meaningful defense." *Id.* The circuit court granted the motion for summary judgment, and we affirmed. *Id.* at 696, 712. We concluded that there was "no doubt that there was an act of destruction" of evidence that was "unquestionably discoverable." *Id.* at 705. We further explained that there was an "intent to destroy the evidence" in that "no one mistakenly demolished the fire scene" and that "the destruction took place when the filing [of suit was] fairly perceived as imminent." *Id.* at 705 (alteration in original) (quotation and citation omitted). Although the insurer preserved the meter and the meter box, we held that "the

16

destruction of the scene deprived [the utility] of any opportunity to look to other possible causes." *Id.* at 706.

The Appellants compare Ms. Mattingly's preservation of the failed anastomosis site to the insurer's preservation of the meter and meter box in *Cumberland*. The Appellants assert that, as the insurer's conduct in *Cumberland* deprived the utility of the "opportunity to look at other possible causes of the fire," Ms. Mattingly's actions similarly deprived Dr. Anand and WAH of the opportunity to discover other possible causes of Mr. Mattingly's death.[11]

We are entirely unpersuaded by the Appellants' attempt to compare a grieving mother's quest to obtain answers about the cause of her son's untimely death and decision to make appropriate final arrangements for her son's remains to a case involving the demolition of a home after a fire. We expressly rejected a similar spoliation argument, albeit in a somewhat different context, in *Hollingsworth & Vose Co. v. Connor*, 136 Md. App. 91, 136 (2000). In *Hollingsworth*, a plaintiff was awarded damages for injuries caused by asbestos-containing products. *Id.* Two months after the jury's verdict, the plaintiff died, and the defendants moved to reopen and revise the judgment to dismiss the plaintiff's claims "based on the refusal by [plaintiff-]appellee's family and counsel to preserve [plaintiff-]appellee's lung tissue as requested by [defendants-]appellants." *Id.* at

---

[11] The Appellants assert that, had they been provided with the opportunity to conduct their own autopsy, they would have performed a toxicology screening which could have determined whether Mr. Mattingly had used illicit drugs "that may, have, in fact, caused his death." Mr. Mattingly did have a history of drug abuse, but there is no evidence in the record that he had been using illicit drugs while hospitalized at WAH.

17

136-37. The defendants-appellants asserted that the decedents' family had engaged in "deliberate spoliation of the evidence resulting from the burial of plaintiff's body without the removal and testing of plaintiff's lung tissue." *Id.* at 137. The defendants-appellants had alternatively requested in the circuit court "an order to exhume plaintiff's body so that the lung tissue could be obtained and tested." *Id.*

We strongly rejected the defendants-appellants' spoliation argument, explaining:

> Appellants have presented not the slightest suspicion of a deliberate spoliation of evidence; **appellants astoundingly compare the burial of a loved one to the destruction of documents**.
>
> * * *
>
> Appellee's family, in their efforts to respect the rights of the deceased, vestigial though they be, understandingly shrunk back from appellants' requests to exhume and disfigure the deceased plaintiff's body. We concede that many dollars are contingent upon the outcome of this case; nonetheless, **we do not place cash before conscience**. Appellants were certainly aware of the lethal nature of mesothelioma, and could have taken the procedural steps necessary, earlier in this action, in order to obtain or preserve the evidence they desired without having to ask for the exhumation of the body. They elected not to go through discovery procedures to request a biopsy or for the preservation of the lung tissue. **We find it unconscionable that appellants now denounce appellee's next of kin and counsel for "deliberate spoliation of evidence," simply because they arranged for their loved-one's burial**.
>
> **Although plaintiff's body had obvious evidentiary value in this case, we perceive no "deliberate spoliation of evidence." The deceased's family properly disposed of the body as would be expected in the circumstances.** We affirm the trial court's rulings regarding the denial of appellants' motions to review or reopen judgment and to dismiss, or, in the alternative, for exhumation of the plaintiff's body.

*Hollingsworth*, *supra*, 136 Md. App. at 137-38 (emphasis supplied).

18

The Appellants assert that, unlike the defendants in *Hollingsworth*, who could have requested a biopsy or the preservation of lung tissue earlier in the discovery process, the Appellants in this case had no other opportunity to inspect or analyze Mr. Mattingly's remains. The Appellants further attempt to distinguish *Hollingsworth* on the basis that, in *Hollingsworth*, neither party was able to present lung tissue evidence. The Appellants assert that this case is distinguishable because only one party, Ms. Mattingly, was provided the opportunity to obtain an autopsy and present evidence from the autopsy, while the other parties were not.

In our view, the key relevant language from *Hollingsworth* is our discussion of the critical difference between decisions made by a grieving family about a loved-one's remains and the intentional destruction of other evidence. After the death of a loved-one, the surviving family members are faced with the task of determining the appropriate disposition of their loved-one's remains. *See* Md. Code (1982, 2015 Repl. Vol., 2019 Supp.), § 5-509 (c) of the Health - General Article ("HG") (setting forth the persons who have the right to arrange for the final disposition of a body of a decedent). This authority includes the authorization for cremation. HG § 5-502. The decisions relating to the proper dispositions of a loved-one's remains are inherently time-sensitive and often fraught.

The Appellants' characterization of a grieving mother as engaging in spoliation simply because she sought answers about her son's untimely demise and subsequently arranged for her son's cremation is equally unconscionable as the appellants' assertions in *Hollingsworth*. The lawful cremation of a family member's remains is not an "act of destruction" in the spoliation context, nor does Ms. Mattingly's decision to have her son's

19

remains cremated evince an intent to destroy evidence. We hold that Ms. Mattingly, a person holding authority over the disposition of her son's remains pursuant to HG §§ 5-502 and 5-509(c), owed no duty to preserve "evidence" and had no obligation to permit Dr. Anand and/or WAH to participate in any autopsy for her son, nor was Ms. Mattingly required to notify Dr. Anand and/or WAH prior to having her son's remains cremated.

In reaching our conclusion, we find particularly persuasive a case from the California Court of Appeal, *Walsh v. Caidin*, 232 Cal. App. 3d 159 (1991). In *Walsh*, a surviving spouse brought a wrongful death claim against healthcare providers alleging medical malpractice. *Id.* at 161. Similarly to the present case, the defendants "alleged that the cremation of [the decedent's] body despite a prior request by [the defendants] for an autopsy deprived appellants of evidence of the cause of death." *Id.* The defendants further "claimed that respondents owed appellants a duty to preserve evidence and that respondents either intentionally or negligently destroyed critical evidence." *Id.*

The California appellate court considered that, pursuant to State statute, "the surviving spouse has the right to control disposition of a decedent's remains" and "[c]remation is an authorized disposition." *Id.* at 162. The court further observed that "[t]he person having the right to custody may, but is not required to, authorize an autopsy." *Id.* The court noted that "in cases where the coroner is required by law to investigate the cause of death, the coroner has a paramount right to custody, including the right to conduct an autopsy, until the conclusion of the autopsy or medical investigation by the coroner," but there was "no indication that the coroner investigated the death involved in this case." *Id.*

20

The California court found that the spoliation doctrine did not apply because "the law recognizes a human corpse is not just another piece of physical evidence." *Id.* at 163. The court explained:

> To allow the cause of action asserted by appellants would contravene the statutory scheme designating the persons having the right to dispose of human remains and the case law prohibiting court-ordered autopsies for civil discovery purposes. To allow appellants' action would treat a dead body merely as another piece of evidence, ignoring the outrage to the surviving family members, to which our case law is sensitive.

*Id.*

Maryland law similarly recognizes the distinction between a human corpse and other types of physical evidence. Indeed, in *Hollingsworth*, *supra*, we found it "astonishing" that the appellants compared the burial of a loved one to the destruction of documents and emphasized that even though significant sums of money may be involved in a case, "we do not place cash before conscience." 136 Md. App. at 137-38. We characterized the appellants' arguments as "unconscionable" when they "denounced" the decedent's next-of-kin for spoliation of evidence "simply because they arranged for their loved-one's burial." *Id.* at 138.

In addition, Maryland law similarly grants the authority to make decisions about the proper disposition of a decedent's remains to the surviving family members. Section 5-509(c) of the Health - General Article provides that, unless the decedent has directed otherwise, " the following persons, in the order of priority stated, have the right to arrange

21

for the final disposition of the body of the decedent, including by cremation under § 5-502 of this subtitle:

> (1) The surviving spouse or domestic partner of the decedent;
>
> (2) An adult child of the decedent;
>
> (3) A parent of the decedent . . . .[12]

As in California, the person who has control of the body for its final disposition may, but is not required to, authorize an autopsy. HG § 5-501(b)(1). Furthermore, as in California, the medical examiner is required to investigate certain deaths, HG § 5-309, but this case does not present such a scenario. Notably, an autopsy from the State Medical Examiner was sought in this case and denied. As in *Walsh*, the Appellants had no right to have an autopsy conducted and cite no law that would support an assertion that they could have obtained a court order for one in this case.

In our view, the analysis of the California Court of Appeal in *Walsh* is consistent with the Maryland statutory and caselaw outlined *supra*. We expressly reject the Appellants' assertion that Ms. Mattingly had a duty to preserve her son's remains in order to allow the Appellants' to undertake their own independent analysis. As in *Hollingsworth*, despite the fact that Mr. Mattingly's "body had obvious evidentiary value in this case," 136 Md. App. at 138, we reject the characterization of the autopsy and subsequent cremation as deliberate spoliation of evidence. Ms. Mattingly made proper arrangements for the

---

[12] The statute sets forth additional persons, in descending order, who have the authority to arrange for the disposition of the body of a decedent. These additional persons are not relevant in this case.

22

disposition of her son's remains "as would be expected in the circumstances." *Id.* We,

therefore, hold that the circuit court appropriately denied the motions for summary

judgment and for judgment on the basis of spoliation.[13]

---

[13] The Appellants assert that the circuit court abused its discretion by failing to exercise any discretion when ruling on the spoliation issue. Specifically, the Appellants take issue with the following comments by the circuit court.

When moving for judgment at the close of the plaintiff's case, the Appellants "renew[ed] the motion that [they] made via summary judgments a month ago on the spoliation issue." The court denied the motion, commenting:

> It's unfortunate, but the issue is whether it's admissible or not. And certainly, it's an appealable issue and a difficult decision to make. And I will stop there and let my superior Court determine whether I was right or wrong.

The Appellants renewed their motion for judgment at the close of all evidence. The court denied the motion, explaining:

> I think there is a jury issue raised. I'm going to deny the motions for judgment at this time. As I have said, it was unfortunate, the circumstances following the demise of Mr. Mattingly in taking him out of the hospital, having a private autopsy done. Frankly, I'd never heard of it before. But it any event, the Court made its ruling. The motions are denied.

The Appellants characterize these comments as a failure of the circuit court to exercise discretion. The Appellants assert that the circuit court "improperly abdicated its responsibility to exercise discretion to the appellate courts" as in *Greater Metro. Orthopaedics, P.A. v. Ward*, 147 Md. App. 686, 699 (2002).

In our view, the circuit court did not abdicate its responsibility to exercise discretion. The record reflects that the circuit court had previously explained its reasoning on this issue in the context of its ruling on the motion to summary judgment. When denying the motion for summary judgment, the circuit court explained the jury was entitled to give the private autopsy the "weight and credibility" they believed it deserved. In light of the circuit court's prior explanation when ruling on the motion for summary judgment, the court's (perhaps inartful) comments about "letting my superior Court determine whether I was right or wrong" were not an abdication of judicial responsibility, but rather an adoption of the court's earlier analysis.

23

We further reject the Appellants' assertion that the circuit court erred by declining to propound a jury instruction on spoliation. Pursuant to Maryland Rule 4-325(c), a trial "court may, and at the request of any party shall, instruct the jury as to the applicable law[.]" We review "a trial court's refusal or giving of a jury instruction under the abuse of discretion standard." *Stabb v. State*, 423 Md. 454, 465 (2011). The Court of Appeals has explained:

> We consider the following factors when deciding whether a trial court abused its discretion in deciding whether to grant or deny a request for a particular jury instruction: (1) whether the requested instruction was a correct statement of the law; (2) whether it was applicable under the facts of the case; and (3) whether it was fairly covered in the instructions actually given.

*Id.* As we explained *supra*, Ms. Mattingly did not engage in spoliation of evidence when she arranged for the appropriate disposition of her son's remains. Accordingly, we hold that no spoliation instruction was generated by the facts of this case, and the circuit court properly denied the request for such an instruction.

## II.

We next consider WAH's assertion that the circuit court erred by denying WAH's motion for judgment on the basis that Ms. Mattingly failed to present expert testimony on the issue of causation. We review the circuit court's ruling on WAH's motion for judgment and renewed motion for judgment *de novo*. *DeMuth*, *supra*, 205 Md. App. at 547.

Ms. Mattingly's claim against WAH was premised upon a single alleged breach of the standard of care by Nurse Matilukuro. To prevail on her claim against WAH, Ms. Mattingly bore the burden of proving, to a reasonable degree of medical certainty, that

24

Nurse Matilukuro breached the standard of care and that Nurse Matilukuro's breach of the standard of care was a proximate cause of Mr. Mattingly's death.

Specifically, Ms. Mattingly alleged that Nurse Matilukuro breached the standard of care by failing to properly follow WAH's Chain of Command Policy. In support of this allegation, Ms. Mattingly presented expert testimony from Nurse Cable. Nurse Cable testified that it was her expert opinion that Nurse Matilukuro should have invoked the Rapid Response Team by 8:30 a.m. due to Mr. Mattingly's shortness of breath, abdominal pain, sweating, and "extremely concerning" vital signs.

On appeal, WAH does not dispute that Ms. Mattingly presented expert testimony on the alleged breach of the standard of care. WAH's appellate argument is focused upon the causation issue alone. WAH asserts that because Ms. Mattingly failed to present expert testimony on the issue of causation, WAH was entitled to judgment as a matter of law. Ms. Mattingly asserts that the evidence of causation was sufficient to submit the claim against WAH to the jury. As we shall explain, we agree with Ms. Mattingly.

In order to establish a claim based on medical malpractice, a plaintiff must present evidence to establish "the elements of duty, breach, causation, and harm." *Barnes v. Greater Baltimore Med. Ctr., Inc.*, 210 Md. App. 457, 480 (2013). "To prove causation, the [plaintiff] had to establish that but for the negligence of the defendant, the injury would not have occurred." *Id.* at 481. "Because of the complex nature of medical malpractice cases, expert testimony is normally required to establish breach of the standard of care and causation." *Id.* We have explained that "[e]xpert witnesses play a pivotal role in medical malpractice actions." *Rodriguez v. Clarke*, 400 Md. 39, 71 (2007).

25

At trial, Ms. Mattingly presented the following evidence in support of her claim that Nurse Matilukuro's breach of the standard of care caused Mr. Mattingly's demise:

- Expert witness Nurse Cable testified that, pursuant to the Chain of Command Policy, Nurse Matilukuro was required to activate the Rapid Response Team by 8:30 a.m. at the latest.

- Expert witness Dr. Jackson testified that "a leaking anastomosis with feculent stool pouring into [the] abdominal cavity is a surgical emergency" that "require[s] an immediate operation."

- Dr. Jackson testified that the standard of care requires that "[e]very hospital in the country that does surgery has somebody who must take call in that hospital, because you can't leave patients abandoned." Dr. Jackson explained that even if the surgeon who did the operation is not available when a post-surgical complication arises, "a physician within the hospital could get called" and there is always "a surgeon on call."

- Dr. Jackson testified that the standard of care required that by 9:00 a.m. or by 10:00 a.m. at the latest, Mr. Mattingly should have been taken to surgery, where his incision should have been re-opened, the abdomen should have been washed, and a new colostomy should have been performed.

- Dr. Jackson testified that even before being taken to surgery, steps should have been taken to treat Mr. Mattingly, including examination by a physician and the administration of IV fluids and antibiotics.

- Dr. Jackson opined that Mr. Mattingly would have survived if the operation had been performed by 10:00 a.m.

In addition, Ms. Mattingly points to the Chain of Command policy, which requires that the Rapid Response Team or Code Blue Team respond to situations of "medical emergencies," which are defined as "life-threatening issue[s]" that require "immediate intervention."

26

In our view, the expert testimony of Nurse Cable and Dr. Jackson outlined *supra*, when considered together and in conjunction with other evidence presented at trial, is more than sufficient to establish the element of causation and permit the claim against WAH to go to the jury. *See Giant Food, Inc. v. Booker*, 152 Md. App. 166, 180, 831 A.2d 481, 489 (2003) (quotations and citations omitted) ("[A]n expert's testimony to a reasonable degree of probability is not always essential to prove causation; rather a plaintiff's burden of proof will be satisfied by expert testimony with respect to causation as to what is possible if, in conjunction with that testimony, there is additional evidence of causation introduced at trial that allows the finder of fact to determine that issue."). The jury could reasonably infer, based upon Nurse Cable and Dr. Jackson's testimony, that the activation of the rapid response team by no later than 8:30 a.m. would have resulted in Mr. Mattingly being taken for surgery within the following ninety minutes. We, therefore, reject WAH's assertion that the circuit court erred by submitting the claim premised upon Nurse Matilukuro's failure to activate the Rapid Response Team to the jury. Accordingly, we affirm.

> **JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANTS.**

27